Tom and Robert Smith *v.* State.

TOM AND ROBT. SMITH *v.* STATE.

(*Jackson.* April 16, 1900.)

1. VERDICT. *For murder in second degree supported by the facts.*

The facts set out in the opinion sustain a verdict against defendants for murder in the second degree. (*Post, pp. 306–315.*)

2. HOMICIDE. *Excusable when done to prevent violent felony.*

A homicide is excusable, which is committed by a private person, in a *bona fide* effort to prevent a violent felony, under the belief, honestly entertained, without negligence, that there is no other way to avert such felony. (*Post, pp. 315, 316.*)

3. SAME. *Same.*

And, as a consequence, the slayer of such intervening person, being the party engaged in such unlawful violence, cannot justify the killing upon the ground that the intervenor's acts were such as to imperil the life of the slayer. (*Post, pp. 316, 317.*)

4. SELF-DEFENSE. *Right of, does not exist, when.*

A party who challenges or provokes a fight, and goes into it armed, intending to use his weapons if an emergency requiring it should arise, cannot invoke self-defense in the difficulty that ensues by reason of his fault, until he has desisted and given his adversary notice of that fact. (*Post, p. 317.*)

Case cited: Irvines *v.* State, 104 Tenn., 132.

5. SAME. *Same.*

A brother cannot fight lawfully for a brother who is engaged at the time in the commission of an unlawful and felonious assault. (*Post, pp. 317, 318.*)

---

FROM WEAKLEY.

---

Appeal in error from Circuit Court of Weakley County. W. H. SWIGGART, J.

CHAS. M. EWING, R. E. MAIDEN and F. P. HALL for Smiths.

Attorney-general PICKLE for State.

BEARD, J. The plaintiffs in error were convicted of murder in the second degree of Henry Fowler, and their punishment was fixed at twenty years confinement in the State penitentiary. Having failed in their motion for a new trial, they have appealed to this Court.

They are brothers; they were also cousins of the deceased, reared on an adjoining farm to that of his mother. But, while relatives and close neighbors, the evidence shows their respective familes had been more or less estranged for several years. Some three weeks before the homicide Tom Smith told several parties that in passing along a road which separated his father's farm from that of the Fowler's, he had discovered the deceased in a compromising position with a young girl, the daughter of one Regan. This story soon became public property, and was not long in reaching the ears of Regan and the deceased. On hearing the report the latter was much disturbed, and sought its author for an interview. What took place at this interview rests alone on the testimony of Tom Smith, the surviving party to it. He stated, while on the witness stand, that in answer to a request on the part of the deceased that he say publicly either that the report in

circulation was untrue, or else modify it in material parts so as to relieve the parties implicated by it, he said ·in substance to the deceased: "You know that what I have told is true, but as you say Regan is very angry about it, I am willing to tone it down by saying I may have been mistaken in at least one of its material parts." He further testified that this seemed to satisfy the deceased, and after further conversation, friendly in character, the latter left him in apparent good humor.

This condition however did not long continue. Both parties were evidently dissatisfied, and each indulged in a good deal of angry talk with regard to the original story, and this effort at settlement. At any rate another attempt at an adjustment was deemed necessary. Who took the initiative in this is not clear; it is probable, though, it was the deceased. This resulted in an agreement for a meeting of these two principals and a few of their respective friends at a place near the point from which Tom Smith claimed to have seen the deceased and the young girl, and at an early hour in the morning on the twelfth of June, 1899.

The plaintiff in error, Tom Smith, communicated to his brothers and others of his friends the afternoon before, the time, place, and purpose of this meeting. One of these friends said to him such a meeting was more likely to produce

than avoid trouble, and suggested instead that he and the deceased select arbitrators to settle the difference between them. To this Smith replied: "I am not afraid of any man, and if Henry Fowler ever comes to my field [referring to their former interview in Smith's field] abusing me, I will give him something to send him out, and it will be a plenty too." To another witness with whom he spoke of the contemplated meeting he said: "When this trouble is settled it will be settled." On the other hand, a number of witnesses testified to conversations which they had with Henry Fowler about the same time. From some of these, according to their testimony, he sought the loan of a pistol. To one he said he would not "tote" (to use his colloquialism) this charge any longer; that Tom Smith had a wife and child, while he had nothing of value to restrain him.

The witnesses who testify as to these conversations with the deceased were all relatives or close friends of the plaintiff in error, Tom Smith; at any rate whatever the deceased was doing and saying was at once communicated to Tom.

On Monday morning, June 12, at an early hour, the deceased, with his brother, Bud Fowler, Regan, and a few other persons, repaired to the place which they understood to be the one appointed for the meeting: waiting for a short time, and Tom Smith and his friends failing to appear, it was suggested that they might, under a

misapprehension, be then at a point a hundred or two yards distant. Upon this suggestion being made, Henry Fowler said he would go, and if he found this to be a fact, he would ask them to join his party where it then was. To this point the record shows that good temper apparently prevailed in this company, in which the deceased shared. He had given no indication there of a malevolent purpose. He said that morning to at least two of the party, when inviting them to become members of it, that there would be no trouble at the meeting, and he was just out of a friendly wrestling match with one of its members when he started on this mission.

The plaintiffs in error agree that he did go to the point where they, with two or three of their friends, were, and after saluting them, that he said his party were awaiting them below, and he asked that they join them there.

There is no pretense that there was any bravado in either manner or speech on the part of the deceased in extending this invitation. Immediately on receiving it the plaintiff in error, Bob Smith, and one Summers, the brother-in-law of the two Smiths, started down the road in the direction indicated, in company with the deceased, and joined his friends. Tom Smith said to them as they left him he would soon follow. On the way down it is not claimed by Bob Smith and Summers that the deceased evidenced bad blood. On

the contrary, they say he was, or seemed to be, in a pleasant mood. When they reached the party of the deceased good nature prevailed there. No violence of word or act was committed. The conversation was such as friends gathered for an idle hour might have indulged in. While thus engaged Tom Smith was heard approaching and making a loud out-cry. This cry, which the witnesses interpret as "ahooahoo," it seems was common to that section of the country, and one which he says he (Smith) often uttered when at his work. When he came within easy hailing distance of the party he said: "You fellows come up to the place agreed on." To this Regan replied: "Come here; this is the place agreed on." When Tom Smith said to him: "You are a liar!" Regan replied: "You cannot come down here and tell me I lie." And Tom advancing, said: "I can, and all of you fellows concerned in this are s——s of b——s." Immediately all the party arose to their feet and moved toward Tom. He says as they came he retreated, but we think the weight of the testimony is that he continued his advance. As they approached one another, Bud Fowler picked up a piece of wood and threw it at Tom. They were then about thirty paces apart. The latter says as Bud was in the act of throwing he called out: "Come on, boys, let's kill him!" And he (Tom) replied: "Boys, don't do this. This is not the way to settle." This statement is

Tom and Robert Smith *v.* State.

denied by the State's witnesses, and evidently the jury gave no credit to it. While no doubt exasperated that plaintiff in error, Tom, should come to a place of meeting intended for a peaceable settlement with defiant manner and an opprobious speech, yet the utterance attributed to Bud is hardly reconcilable with his quiet and pleasant manner up to that moment. On the other hand, in view of his turbulent approach and offensive words, and his admission that he was not frightened, but "simply excited," we think the inherent probability, as well as the weight of the affirmative evidence, is against the truth of this statement of Tom Smith.

What then occurred may be given in a summary of the testimony of the witnesses for the State, and of the plaintiffs in error, the statements of the latter being supported by a sister, who says she came on the ground in time to see the whole difficulty.

The witnesses for the State say as Bud Fowler, at a distance of thirty steps from Tom Smith, was in the act of throwing the piece of wood, as has been before stated, the latter pulling his pistol fired at him, but missed his aim; that having thrown the wood, notwithstanding the fire, Bud continued to advance, and as he did so he stooped and broke a sassafras root partly decayed, and for its size light in weight, and hurled this at Tom Smith. One of these pieces of wood hit

the latter on the elbow. About the time of the cast of the last of these, Tom Smith again fired at Bud, and again missed him. Bud and Tom finally came together. When Bud having seized Tom with one hand the latter fired the third shot, his pistol being so close as to powder-burn his victim's body. This shot brought Bud Fowler to the ground with a mortal wound.

On the other hand the plaintiffs in error both testify (and in this they are corroborated by their sister, Mrs. Glascow) that Bud Fowler having thrown the two pieces of wood, as has been stated, rushed on Tom and struck him a heavy blow on the wrist with a part of a brick, about one-half of a whole, and then dropped his· hand to his pocket as if to draw a pistol, at which instant, Tom, believeing himself in imminent danger, fired the fatal shot.

The jury, however, did not credit this testimony, but evidently accepted that of the State's witnesses, and in doing so we think were well warranted. In the first place, we are satisfied Bud Fowler had no brick. He was without his coat at the time of the difficulty, and it would have been impossible for him to have effectually concealed about his person an article as large as this is claimed to have been; nor is there any pretense that there were bricks lying about on the ground at this place of meeting. In the second place, it is not even suggested that Bud

was armed at that time with either pistol or knife. Then, why should he have released his hold to make this fruitless demonstration towards his pocket when at that moment his adversary held threateningly the muzzle of the loaded pistol in close proximity to his body?

We are satisfied there was no justification for this shooting; that there was nothing in the attitude or conduct of Bud Fowler to raise in the mind of Tom Smith a reasonable apprehension of death or great bodily harm.

This conviction, however, is not for the killing of Bud, but of his brother, Henry Fowler. We will now turn to the facts attending this latter homicide.

The witnesses for the State agree that Henry Fowler was in the party which advanced with Bud Fowler, and that as Tom Smith was shooting at Bud, Henry passed in front of plaintiff in error, Bob Smith, on toward Tom, and as he did so Bob Smith shot him in the back, and Tom having disabled Bud, immediately turned on Henry Fowler and fired into him four times, two of the shots being given after the latter had fallen on the ground. These witnesses also state Henry was unarmed, or, if armed, that they saw no evidence of it.

On the other hand, the plaintiffs in error deny that Bob Smith shot at all, and agree in their testimony that Tom did the shooting, all of his

four shots aimed at Henry taking effect in different parts of his body. They state while Tom Smith was engaged with Bud, Henry Fowler, drawing his pistol, rapidly advanced on Tom Smith, firing two shots as he so advanced, when the latter, having disposed of Bud, turned his weapon on Henry, and, in order to save his own life, fired at Henry four times in quick succession; that the two shots fired at Henry after he fell were occasioned by the latter's having raised himself to his elbow and firing one more shot at Tom Smith. In this statement these parties are also supported by their sister, Mrs. Glascow.

The issue raised as to whether the deceased had a pistol was settled against the claim of the plaintiffs in error; but for the disposition of this cause it may be conceded that he did, and that he fired at Tom Smith, as is claimed by the plaintiffs in error and their sister.

That the weight of the testimony is that Bob Smith shot Henry Fowler in the back, under the circumstances insisted on by the State, we are entirely satisfied. It is uncontradicted that Bob went to this meeting with a pistol in his pocket, and a butcher knife concealed about his person, both of which weapons at a subsequent stage of this affray he used upon the body of Regan.

We also think it clear that Tom Smith had in the beginning an unfriendly feeling for Henry Fowler, and the circulation of the story in ques-

Tom and Robert Smith *v.* State.

tion by him was but an evidence off it; that the ineffectual effort at adjustment, followed by the appointment of this meeting in the presence of witnesses, had exasperated this feeling until it became, if not before, one of pronounced hostility. We have no doubt in this mood he armed himself with a view to the meeting, and, in full sympathy with him, that his brother Bob also was heavily armed. In addition, the record shows that this affray was hardly on, or at least it was not well over by the killing of Henry Fowler, when suddenly there appeared on the scene two other of the Smith brothers with loaded guns. The facts seemed to indicate preparation for serious trouble by various members of this family. At any rate the conduct of Tom Smith shows, as we think is clear on the record, he was not on a peaceful errand. Not only did he go to this meeting armed, but upon getting near, by an offensive approach and still more offensive epithets he provokes a difficulty, and then, turning his pistol, makes a deadly assault upon Bud Fowler, an unarmed man, when he had no reason to fear a felonious assault from him.

Under these circumstances, Henry Fowler had a right to intervene, and even slay, to save, if possible, the life of Bud Fowler, his brother. This right of intervention is well settled. "Where a felony is attempted upon any one, not only the party assaulted may repel force by force, . . .

but any other person present may interpose to prevent the mischief, and if death ensue, the party so interposing will be justified." 1 Russell on Crimes, p. 670. In *Handcock v. Baker,* 3 Bos. & Pul., 265, it is said: "It is lawful for a private person to do anything to prevent the perpetration of a felony." Mr. Wharton, in his work on Criminal Law, Vol. 1, Sec. 495, on this point lays down the rule thus: "A *bona fide* belief by the defendant that a violent felony is in process of commission, which can only be averted by the death of the supposed felon, makes the killing excusable homicide, though if such belief be negligently adopted by the defendant, then the killing is manslaughter." To the same effect is 1 Bish. on Criminal Law, Sec. 877, while in Desty on Criminal Law, Secs. 125*d*, 126, 126*a*, the following statement of the rule is found: "A well grounded belief that felony is about to be committed will extenuate homicide committed in prevention, but not in pursuit by a volunteer. . . . A *bona fide* belief that a felony is in process of commission, which can only be arrested by the death of the supposed felon, makes the killing excusable; but the belief must be honestly entertained and without negligence."

Under this well-settled principle, if Henry Fowler, thus intervening, had killed Tom Smith, it would have been a case of excusable homicide. The reverse of this is equally true. The rule

which would have excused Henry Fowler condemns his slayer. So it is, Tom Smith cannot avail himself of the plea of self-defense, when his own wrongful act had given to Henry Fowler the right of intervention.

In addition, we repeat here what was announced as a rule of law in the case of *Irvine* v. *State*, 104 Tenn. Where the defendant by his conduct challenges or provokes the fight, and has gone to it armed with the purpose to use his arms upon his adversary, if the emergency occurs, he cannot, after having slain him, say he acted in self-defense. A man may not, under such conditions, provoke a quarrel, and then, taking advantage of it, excuse homicide.

In such a case, in order for the right of self-defense to arise, the party whose wrongful aggression has brought on the difficulty must not only desist from it but he must give his adversay notice that he has desisted; until this has been done the original aggressor cannot kill. *Irvine* v. *State*. supra. On this point there was nothing in the charge of the trial Judge of which plaintiffs in error can properly complain. Nor was there error in the failure of the Court below to say to the jury that if Bob Smith went to the place of meeting with the purpose to fight only in the defense of his brother Tom, then he would not be guilty of any offense. For Bob cannot excuse himself as a guilty participant in the affray,

Tom and Robert Smith *v.* State.

if his brother Tom brought it on with a view to, or was at the moment engaged in, a felonious assault on Henry Fowler. In such event. as has already been seen, Tom Smith could not justify himself for slaying his adversary, and no more could Bob Smith excuse himself for his unwarranted interference. Under such circumstances, he would be an aider and abettor, and responsible with his brother for the unlawful killing.

Many other errors were assigned at the bar upon the brief of the counsel of the plaintiffs, all of which were disposed of orally.

We are satisfied with the conduct of the trial, and that upon the law as given to the jury, and the evidence adduced, the verdict of guilty of murder in the second degree was one of which these plaintiffs in error have no right to complain.