**S.M.R. ENTERPRISES, INC.,**
**Plaintiff-Appellee,**

v.

**SOUTHERN HAIRCUTTERS, INC., and**
**Donald M. Bridges,**
**Defendants-Appellants.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 31, 1983.

Permission to Appeal Denied by
Supreme Court Nov. 21, 1983.

H. Naill Falls, Jr., Stephen W. Ramp, Farris, Warfield & Kanaday, Nashville, for plaintiff-appellee.

John T. Baird, Harpster & Baird, Memphis, for defendants-appellants.

## OPINION

CONNER, Judge.

The sole issue here presented for review is whether the chancellor erred in denying the T.R.C.P. 60.02 motion for relief from judgment of defendants-appellants, Southern Haircutters, Inc. and Donald M. Bridges,[1] based upon newly discovered evidence.

The material facts, as recounted in an opinion of this court when this cause was earlier before us, are as follows:

SMR Enterprises, Inc., a franchisor of family hair care centers known as "Fantastic Sam's," brought suit against its Nashville area franchisee, Southern Haircutters, Inc., alleging that the franchisee opened a new store in Hendersonville after plaintiff had expressly disapproved the location. Defendant Donald M. Bridges is the chief officer and majority shareholder of Southern Haircutters, Inc. Mr. Sam M. Ross is the president and majority stockholder of SMR. The franchise agreement between the parties provides that the franchisee may open additional locations only with the express, written consent of the franchisor and that such consent shall not be unreasonably withheld. The franchise agreement further provides that either party may terminate the agreement in the event of a material breach by the other party by bringing an action of termination in a court of competent jurisdiction in the franchisee's area.

Plaintiff filed its complaint on March 6th, 1980 seeking injunctive relief, termination of the franchise agreement and an award of attorneys' fees. Following a hearing, the trial court ordered a temporary injunction on March 18th, 1980, enjoining defendants from operating a franchise in the contested Hendersonville location. The case was heard on its merits on October 6th, 1981. The proof adduced was as follows:

From March 1976 through August 1977 a prior franchisee, James Currier, operated a Fantastic Sam's Family Hair Care Center in the Imperial Square Shopping Center on Gallatin Road in Hendersonville, Tennessee. Defendant Bridges purchased Mr. Currier's franchise in September 1977. Mr. Currier did not sell the location at Imperial Square; instead, he renamed the shop the "Scissors Wizard" and continued in operation. He went out of business some months later. SMR produced data demonstrating that this location had performed poorly compared to sales in other franchise territories. Mr. Bridges testified that the Imperial Square location had the best performance record of the three franchise locations in Nashville at that time.

Mr. Bridges testified that Mr. Ross, president of SMR, had visited the Hendersonville location many times and personally approved it when he visited Nashville in August 1978. Mr. Ross denied this.

Ms. Angela Aikens, vice-president of real estate for SMR, visited Mr. Bridges in Nashville in May 1979 to scout potential locations. It is her testimony that the defendant told her that the Hendersonville location was available, but that he would not consider it because it was a "loser." The report she submitted to the company as a result of her trip made no mention of such location.

Defendants' counsel wrote SMR Enterprises on November 29, 1979, indicating that the Hendersonville location had been previously approved by Sam Ross and Angela Aikens. Both Ross and Aikens denied ever having approved that loca-

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

tion. By letter of December 5, 1979, Mr. Carnall, general counsel of SMR Enterprises, notified Mr. John Baird, counsel for defendants, that the Hendersonville location had not been approved and defendants needed to seek approval before entering into a lease agreement.

Plaintiff instructed Ms. Aikens, the officer at SMR Enterprises in charge of examining and evaluating proposed locations for new franchise stores, to conduct an examination of the proposed Hendersonville location. Her demographic analysis in January of 1980 revealed that the proposed location was completely unsatisfactory. The mall itself, which had been opened in 1975, was still 40% unoccupied in 1980. She estimated that almost 40% of the rental space had never even been fully finished for possible leasing. The mall had experienced frequent tenant turnover. Further, it had poor visibility and difficult access, and the specific space within the mall proposed by defendants was very poor. She added that even if she were to approve the location the interior of the shop would need substantial renovation which Mr. Bridges refused to consider.

Plaintiff informed defendants that the location was not approved. Ms. Aiken's report was forwarded to them. Plaintiff offered to arbitrate the issue of the reasonableness of the disapproval but defendants refused. In late February 1980 defendants opened at the Hendersonville location.

Throughout their business relationship there has been a considerable amount of acrimony between the parties. Early in 1977 Mr. Ross notified Mr. Bridges that he was going to terminate his franchise because of breaches of the contract, *i.e.,* Mr. Bridges was defaulting on payments owed to the franchisor. Mr. Bridges obtained a temporary injunction to halt the cancellation of the franchise agreement. The parties entered into negotiations and settled that case in April 1979.

As a result of the negotiations the parties redrafted their franchise agreement. The new agreement provided that the franchisee would not be required to pay a franchise fee for any locations opened during the first year of the agreement. Thereafter he would be required to pay a franchise fee of $2500 for each new location opened. In October 1979 defendants filed an anti-trust suit against the plaintiff in federal court which has not yet been concluded.

The trial court held that defendants had opened at the Hendersonville location after the site had been disapproved by plaintiff and, further, that plaintiff's decision to withhold approval was not unreasonable. The court entered a permanent injunction enjoining defendants from operating in the Hendersonville location; it failed however, to order termination of the franchise agreement between the parties.

This court went on to hold that the "[d]efendants materially breached the agreement by opening the Hendersonville location without plaintiff's approval and the agreement should be terminated." Our supreme court denied the franchisee's application for permission to appeal.

On October 15, 1982, defendants filed a T.R.C.P. 60.02 motion seeking relief from the judgment on the ground of newly discovered evidence. Said motion stated in pertinent part:

Throughout the trial, the franchisee maintained that the franchisee (sic) had approved the Hendersonville location although it was unable to find any written approval. Sam M. Ross, President and majority stockholder of the franchisor, denied that the franchisor had approved the Hendersonville location.

The franchisee has now located a copy of a letter dated May 23, 1978 from the then Vice-President of the franchisory, (sic) A.F. Palogonia, (sic) which approves the Hendersonville location and moreover does so upon "Sam Ross' assurance that

the location was and still is suitable for a Fantastic Sam's. . . .

WHEREFORE, the franchisee moves this Court to set aside its Decree and to dissolve its permanent injunction.

The subject letter, written on "Fantastic Sam's" stationery, states:

May 23, 1978

TO: Donald M. Bridges

RE: Approval-Southaven, MS./Hendersonville, TN.

I am approving the location on Millbranch Road in Southaven, Mississippi. In the Imperial Square Mall in Hendersonville, Tennessee; I will approve the location but will not be responsible since I have not physically seen the area. I am approving Hendersonville on Sam Ross's assurance that the location was and still is suitable for a Fantastic Sam's.

If you have any questions please contact me.

Sincerely,

/S/ A.F. Palagonia

A.F. Palagonia

Vice President

In its response to the motion plaintiff asserted that the location in question had been approved by S.M.R. in 1976 for operation of a franchise store by James Currier; that the Currier franchise ceased operations in 1977 or 1978; that the first indication to S.M.R. that defendant Bridges intended to open a store at Imperial Square Mall was in late November of 1979; that at that time Angela Aikens, S.M.R.'s then vice president of real estate, began preparation of a demographic analysis of the property; that in December, 1979, Ms. Aikens' report stated the proposed site was completely inadequate for operation of a S.M.R. franchise; and that based on Ms. Aikens' findings the location was expressly disapproved. In addition, plaintiffs noted that the letter in question was written more than 18 months before the dispute underlying the transaction arose and that there was a considerable passage of time and change in circumstances between the 1976 Currier approval and the late 1979 Bridges disapproval, including the execution of an entirely new agreement between the parties.

On October 23, 1982, the trial court overruled the T.R.C.P. 60.02 motion. Defendants appeal.

Defendants' primary argument is that the "newly discovered evidence," i.e., the May 23, 1978, Palagonia letter, completely negates the factual foundation of the June 25, 1982, decree of this court ordering termination of the franchise agreement. In other words, defendants contend that the letter conclusively shows that they in fact had written approval for opening a store at the Hendersonville location; that the same was not a breach of the franchise agreement; and that this court erred in ordering termination thereof. Defendants further contend that they exercised due diligence in attempting to locate the "approval" letter for the original trial but were unable to do so because their business files and records were then dispersed in that four other lawsuits between these parties were proceeding simultaneously with the instant action. Finally, defendants maintain that the harsh remedy of forfeiture was inappropriate under the circumstances.

■ For several reasons, we believe the trial court was correct in denying relief.

In the first instance the Palagonia letter predates by 11 months the negotiation and execution of the operative document in this litigation, the franchise agreement of April 21, 1979. At the time of that agreement the parties were in an intense adversarial posture. In fact, they were then already in litigation. As acknowledged by counsel for defendants during oral argument, in reaching that accord each party was careful to "dot all the 'i's' and cross all the 't's.'" Yet with the new franchise agreement executed in this context it fails to make any mention whatsoever of the Hendersonville location. Reason dictates that an entity in the heat

of negotiation to terminate pending litigation and clarify franchise rights would insist that the written agreement, which would thereafter govern its rights, duties and liabilities, reflect the crucial fact of new location approval.

Article III of the agreement of April 21, 1979, states that the franchisee, defendant Bridges, "agrees to establish initial locations at Murfreesboro Road in Nashville, and in Hermitage, a suburb of Nashville, all of which locations are currently in operation. . . ." It then provide for the opening of new locations:

The FRANCHISEE(S) shall have the exclusive right to use FRANCHISOR'S names and system as described in Article I for additional locations within the territory according to the following terms and conditions:

1. *Each additional location is contingent upon and subject to express written consent of the FRANCHISOR.* However, such consent shall not be unreasonably withheld.

2. *FRANCHISEE(S) shall submit in writing to FRANCHISOR the request for any additional locations, together with all pertinent market data for said proposed locations.* (Emphasis supplied.)

■ We reiterate that there is no mention whatsoever of the Hendersonville location at issue or of any pre-existing approval of the opening of a new store at that or any other location. Had defendants intended to open in Hendersonville or to rely upon any prior approval of that location, they should have reflected their understanding in Article III. The maxim *expressio unius est exclusio alterius* is here applicable. Its meaning is that the expression of one implies the exclusion of the others. Stated differently, where a contract by its express terms includes one or more things of a class it simultaneously implies the exclusion of the balance of that class. *See* 17A C.J.S. *Contracts* § 312. Here, since the contract expressly mentions the Murfreesboro Road and Hermitage locations but none other,

the logical implication is no other sites were then approved.

After the execution of the franchise agreement in April of 1979, defendants could open new stores at locations other than the two specifically identified in Article III only by making written request, providing relevant market data and obtaining written consent from the franchisor.

■ We believe that any agreements or understandings regarding possible locations for new stores that predated the execution of the franchise agreement ceased to have legal import or significance upon its execution. Or, stated differently, the Palagonia letter was superseded by the April 21, 1979, franchise agreement. *See Bringhurst v. Tual,* 598 S.W.2d 620 (Tenn.App.1980); *American Fruit Growers v. Hawkinson,* 21 Tenn.App. 127, 106 S.W.2d 564 (1937). Article XIX of that contract expressly provides that it is "the entire and complete Franchise Agreement between the parties and it may be modified or changed only by written instrument signed by both parties."

Not only was it 11 months after the Palagonia letter before the operative franchise agreement was executed, it was an additional 7 months, or a total of 18 months from the date of the subject letter, before defendants first advised S.M.R. they intended to open at the location in question. According to the testimony of Ms. Aikens in the original proceeding, this was 6 months after defendant Bridges had acknowledged to her that the Hendersonville location was "a loser."

■ Defendants contend that plaintiff was bent on a course to destroy them and that the disapproval of the Hendersonville mall location was part of this total plan. The record herein does not support this assertion. It was S.M.R. which offered to arbitrate the question of approval of the Hendersonville site. Such arbitration could have avoided the ultimate harsh outcome of forfeiture. However, defendants refused to arbitrate.

Defendants claim the Palagonia letter is conclusive evidence that Sam M. Ross, President of S.M.R. perjured himself in his previous testimony that he had not approved the Hendersonville site. We cannot agree. When that testimony is taken in the context of the question at the original trial as to whether approval had been given pursuant to the franchise agreement of April 21, 1979, the perjury claim is simply without merit. Significantly, neither in its pleadings nor proof at the first trial, did the defendants ever rely on or even suggest that there had ever been any *written* approval of the Hendersonville location by either Mr. Palagonia or anyone else.

Defendants made the following assertion in their brief on this appeal:

> ... Defendants-Appellants had sought a resetting of the original trial date of this cause, because it had been unable to locate said letter of approval. Being unable to obtain such resetting, Defendants-Appellants were forced to go to trial without a critical piece of evidence.

There is not one iota of proof in the record to justify this contention. In fact, it is inconsistent with defendants' own testimony at trial.

Further, we are constrained to note that even assuming *arguendo* some relevancy and legal effect the Palagonia letter is less than definitive regarding approval. Where in the mall is the store approved? In what direction must the location face? How many square feet are involved and in what configuration? Of course, absolutely none of these questions are answered and no other detail is given. It is common knowledge that store location within a mall is a consideration second only to location of the mall itself.

█ Defendants last complain that even if they committed a material breach of the franchise agreement the remedy of forfeiture was too harsh. This contention is likewise without merit. We carefully considered this contention on the first appeal and rejected it. Our supreme court denied defendants' application for permission to appeal that judgment wherein we decreed forfeiture was the proper remedy based upon the express language of the contract. Thus, on this issue, the law of this case has been settled.

█ Finally, we note that a new trial can be granted because of newly discovered evidence only when it is clear that the introduction of such evidence at a subsequent retrial would produce a different result. *Smith v. Steele*, 44 Tenn.App. 238, 265, 313 S.W.2d 495, 507 (1956); *Bean v. Commercial Securities Co.*, 25 Tenn.App. 254, 267, 156 S.W.2d 338, 347 (1941). As our above discussion indicates, this burden has not here been met.

Accordingly, the judgment of the trial court overruling defendants' motion for relief from judgment is affirmed and this cause is remanded. The costs are taxed against the defendants.

AFFIRMED AND REMANDED.

TODD, P.J. (M.S.), and CANTRELL, J., concur.