**Pamela J. WRIGHT, Plaintiff/Counter–Defendant/Appellant,**

**v.**

**Dale M. QUILLEN, Defendant/Counter–Plaintiff/Appellant.**

Court of Appeals of Tennessee, Middle Section.

March 29, 1995.

Rehearing Denied April 24, 1995.

Permission to Appeal Denied by Supreme Court Oct. 2, 1995.

William R. Willis, Jr., Gregory D. Smith, Willis & Knight, Nashville, for plaintiff/appellant.

Richardson R. Lynn, Michael J. Flanagan, Nashville, for defendant/appellee.

## OPINION

CANTRELL, Judge.

The principal issues in this divorce case are the common ones associated with such cases: the extent, the valuation, and the division of the marital estate; the awards of alimony, child support, and attorneys' fees. A case of uncommon hostility and violence, however, produced some uncommon issues on appeal: the right of one of the parties to represent himself; whether wife's counsel should have been disqualified from continuing to represent her; whether Rule 11 sanctions against one party were proper (or adequate); and whether the court should have granted a new trial on the basis of newly discovered evidence. We affirm with one minor modification.

### I.

In 1980 Dale Quillen, a successful Nashville lawyer, fifty-five years old, three times divorced with three grown children, met Pamela Wright, a twenty-eight year old college graduate, the manager of a Group Home in Lebanon, and part owner of the Four Seasons Travel Agency. Although the parties maintained separate residences, they soon began traveling together and their relationship became increasingly intimate.

In 1981 Ms. Wright sold her interest in Four Seasons Travel and with legal assistance from Mr. Quillen's law firm, chartered her own travel agency. At the time of the divorce Wright Travel had become a multi-million dollar corporation with offices in thirty cities. The value, ownership, and division of that business is the biggest single question involved in this appeal.

The parties married in 1982 and a son, Christopher, was born in 1984. During the marriage the parties acquired a large amount of property, sold some of their separate property and co-mingled their funds to some extent. Mr. Quillen continued his successful legal practice.

In 1991 Ms. Wright bought another home, moved out of the marital residence, and filed this action for divorce. Mr. Quillen filed a counter-complaint and the record contains an avalanche of amendments, petitions, and motions. The tension between the parties grew and ultimately culminated in a physical encounter between Mr. Quillen and Ms. Wright's counsel (in which one was seriously injured) after her counsel abruptly terminated Ms. Wright's discovery deposition. The chancellor held Mr. Quillen in contempt and ruled that he could no longer represent himself.

The case finally came to trial in July of 1993 before the chancellor and a jury. After many days of testimony the jury answered seventy-seven special interrogatories submitted by the court and the parties. The chancellor worked through a multitude of post-hearing motions and entered a final decree on February 8, 1994. The decree divorced the parties from each other, awarded custody of the child to Ms. Wright, and divided the marital property. Mr. Quillen was ordered to pay $1,950 per month in child support and Ms. Wright was ordered to pay $3,000 per month as alimony to Mr. Quillen until his death or remarriage. With respect to Wright Travel, the decree awarded it to Ms. Wright as her separate property but awarded Mr. Quillen $500,000 as his share of the increase in value during the marriage. Mr. Quillen was awarded his law practice as his separate property.

## II. Wright Travel

### a. Ownership

■ Mr. Quillen asserts that Wright Travel is a partnership and that he and Ms. Wright own it as equal partners.

■ Under Tennessee law "a partnership is an association of two (2) or more persons to carry on as co-owners a business for profit." Tenn.Code Ann. § 61-1-105. Although the existence of a partnership may be implied from the circumstances, *Bass v. Bass*, 814 S.W.2d 38 (Tenn.1991), the circumstances must show that the parties intended to share the profits from their joint enterprise. *Pritchett v. Thomas Plater & Co*, 144 Tenn. 406, 232 S.W. 961 (1921). The controlling intention is that ascertainable from the acts of the parties. *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64 (1955).

In this case there was no partnership agreement and we fail to see how we could find an implied partnership. The business was in fact incorporated in 1981—a year before the marriage—with Ms. Wright as the sole shareholder. She has made all the business decisions, and until the divorce was filed Mr. Quillen resolutely disclaimed any interest in the company. He was not an officer, director, or employee. When he advocated selling the business, Ms. Wright vetoed the idea.

Although an employee in Mr. Quillen's office prepared the charter for Wright Travel, Inc., and Mr. Quillen paid the filing fee, all the other cash transactions between Mr. Quillen and the corporation were characterized as loans and not as capital contributions or profit withdrawals. Mr. Quillen did give Ms. Wright some office furniture and he purchased an ad for the agency when it first started doing business, but it appears that he did these things in consideration for a release of any liability for malpractice based on some advice he had given in connection with Ms. Wright's separation from Four Season's Travel.

### b. Value

The jury valued Wright Travel at $1,750,-000. The estimates of value in the record

ranged from $1,000,000 to $5,000,000, so the verdict was within the extremes in the record. *See Wallace v. Wallace,* 733 S.W.2d 102 (Tenn.App.1987).

Mr. Quillen does not attack the verdict directly. Instead he argues for a new trial on three grounds: (1) the trial judge's error in allowing Ms. Wright's valuation expert to testify, (2) newly discovered evidence impeaching Ms. Wright's expert, and (3) newly discovered evidence of value.

## 1. The Expert

■ Ms. Wright presented Jeffery Miller, an attorney, a consultant to travel agencies, and the owner of a publishing company, the Miller Travel Group, Inc., as an expert witness on the value of Wright Travel. Mr. Quillen objected to his testimony on the ground that Mr. Miller had previously represented Wright Travel which made him counsel for Mr. Quillen as well. Testimony by an attorney against his former client gives the appearance of impropriety; it may involve confidential information gained in the prior representation or it may result in a classic conflict of interest. *See* Rule 8, Rules of the Supreme Court, DR 4–101, DR 5–105 and DR 9–101.

We think, however, that all of these objections disappear in the wake of our decision that Wright Travel is not a partnership. Mr. Miller never represented Mr. Quillen personally, and there is no indication that he ever obtained from Wright Travel any information personal to Mr. Quillen.

Mr. Quillen also argues that Mr. Miller's testimony should have been excluded because his opinion was based on out-of-date information and because it was derived from a methodology not approved by the Tennessee courts. Mr. Quillen does not directly attack Mr. Miller's qualifications as an expert.

■ As to the staleness claim, our statutes require that marital property should be valued "as of a date as near as reasonably possible to the final divorce hearing date." Tenn.Code Ann. § 36–4–121(b)(1)(A). The divorce hearing took place in July and August of 1993 and the latest yearly information

Mr. Miller possessed covered the 1991 calendar year.

He gave an opinion, however, about the value of the business (between 1.6 million and 1.7 million) at the time of the trial. He testified that he received updated financial and marketing information and reviewed all the factors that go into forming an opinion about value. He said he did not know the amount of the current receivables and payables, but that it did not affect the value of the business in a significant manner. In his opinion the value of businesses like Wright Travel had remained level or had actually declined over the six months to a year prior to the trial.

■ We think the expert's testimony related to the value of Wright Travel as of the date of the trial. The objections to the reliability of the data on which he based his opinion go to the weight to be given his testimony and not to its admissibility. Admissibility, relevancy, and competency questions address themselves to the discretion of the trial judge. *State v. Ballard,* 855 S.W.2d 557 (Tenn.1993). We find no abuse of discretion in this case.

■ As to Mr. Miller's methodology, we have said that determining the value of a closely held corporation is not an exact science, and the courts have not articulated a consistent approach to the problem. *Wallace v. Wallace,* 733 S.W.2d 102 (Tenn.App.1987). Two recognized approaches are the "Delaware Block Method", *see Blasingame v. American Materials, Inc.,* 654 S.W.2d 659 (Tenn.1983) and the method described in Revenue Ruling 59–60, 1959–1 C.B. 237. *See Wallace v. Wallace,* 733 S.W.2d 102 (Tenn. App.1987). Mr. Miller did not follow either of these methods. In fact, he disclaimed any knowledge of either approach.

He used a method he developed specifically for the travel agency business, which he calls the marketing approach. This method looks at the type of sales, the client base, the average cost of issuing a ticket, the major airlines in the area, and the firm's major clients. Based on these factors and his knowledge of the sales price of other travel agencies, Mr. Miller forms an opinion as to

the value of the company under consideration. Historical data concerning income, or profitability, plays a small part in his scheme because of the rapidly changing climate in the deregulated airline industry. Using this methodology Mr. Miller has appraised dozens of travel agencies.

■ While Mr. Miller disclaimed any knowledge of Revenue Rule 59–60, some of the factors he considers important also appear in that publication; i.e. the nature of the business; the economic status of the industry; earnings; the existence or lack of good will or other intangible value; the selling price of comparable securities relative to their earnings, dividends, and asset values. In this state where "[T]he choice of the proper method or combination of methods (to determine value) depends upon the unique circumstances of each corporation" *Wallace v. Wallace,* 733 S.W.2d at 107 (Tenn.App. 1987), we think Mr. Miller's methods form a basis "reliable enough to assist the jury to reach an accurate result." *State v. Ballard,* 855 S.W.2d at 562 (Tenn.1993).

## 2. Newly Discovered Impeaching Evidence

■ In his trial testimony Mr. Miller stated that he did not attribute any value to the renewal of Wright Travel's computer reservations system contract. In an article that appeared in *Travel Weekly* on September 23, 1993, he is quoted as saying that (1) a good negotiator can negotiate a deal that can help control automation costs and (2) he has seen bonuses and soft dollar awards for travel agents that exceed contractually-set productivity goals. Another person is quoted in the article as saying that the contract value may be as much as $10,000 per terminal.

Mr. Quillen argues that the trial court should have granted a new trial on the basis of this evidence. We fail to see, however, how the newly discovered evidence requires a new trial. It is arguable that Mr. Miller's statements in the article imply that computer terminals have some value (although a reading of the entire article leaves one with the vague feeling that he is talking about something else) and these contradictory statements could be used for impeachment pur-

poses. But this court has held that newly discovered opinion testimony or newly discovered evidence for contradicting or impeaching purposes alone are not grounds for granting a new trial. *Monday v. Millsaps,* 37 Tenn.App. 371, 264 S.W.2d 6 (1953). *See also Hawkins v. State,* 220 Tenn. 383, 417 S.W.2d 774 (1967); *Harper v. State,* 206 Tenn. 509, 334 S.W.2d 933 (1960).

Mr. Quillen also argues that on the basis of the newly discovered evidence Mr. Miller's testimony should have been disregarded altogether. We think this issue is simply a restatement of the previous issue. Even if we were inclined to disregard Mr. Miller's testimony it would not support a modification of the final decree unless we also granted a new trial on the value of the business. That value has been found by the jury and unless we set the verdict aside, it fixes the value of the principal asset in this case. We have indicated that we are not inclined to set aside the verdict on the basis of the impeaching evidence found in the magazine article.

## 3. Newly Discovered Evidence of Value

■ Mr. Quillen also argues that the chancellor should have reopened the proof to consider evidence of a comparable sale of another travel agency in Nashville. We assume the issue really is "the chancellor should have granted a new trial on the question of value because of newly discovered evidence." The motion, however, is not supported by anything showing what the newly discovered evidence would be. There is only a bare allegation that another travel agency has been sold and that the value it sold for *might* have some bearing on the value of Wright Travel. Since a new trial can be granted because of newly discovered evidence only when it is clear that the introduction of such evidence at a subsequent trial would most probably produce a different result, *S.M.R. Enterprises v. Southern Haircutters,* 662 S.W.2d 944 (Tenn.App.1983), the chancellor cannot be faulted for not granting a new trial on the basis of this motion.

## III. The Division of Marital Property

### a. Wright Travel

■ The chancellor held that Wright Travel was Ms. Wright's separate property

but that the increase in value during the marriage—from $50,000 to $1,750,000, according to the jury's verdict—was marital property. We have previously rejected the contention that the business was a partnership. We are also convinced that the business should be considered as Ms. Wright's separate property. The chancellor's finding that the increase in value was subject to division as marital property is in accordance with Tenn.Code Ann. § 36–4–121(b)(1)(B) (making the increase in value of separate property during the marriage marital property if both parties substantially contributed to its preservation and appreciation.)

The chancellor awarded Mr. Quillen $500,000 or 29.411765% of the increase in value during the marriage. In addition Mr. Quillen was not required to repay approximately $145,000 he had borrowed from the corporation. The chancellor held that the proceeds of these loans were used for family purposes and should be treated as withdrawals, not as debts to be repaid.

While this asset should not be viewed in isolation but should be viewed as part of the total award to each party, we think the chancellor's award to Mr. Quillen represented an equitable division of Wright Travel's increase in value. Ms. Wright was and is the life force of Wright Travel. It was her idea and she devoted herself to it full time. Mr. Quillen devoted his time to his law practice. Undoubtedly he contributed something to the success of Wright Travel, but not nearly to the extent Ms. Wright did.

### b. Mr. Quillen's Law Practice

■ The chancellor awarded the law practice to Mr. Quillen as his separate property. Ms. Wright argues that some part of the law practice should have been considered marital property under Tenn.Code Ann. § 36–4–121(b)(1)(B). While it is true that Mr. Quillen benefitted from his ability to borrow funds from Wright Travel—and Ms. Wright should be considered as having contributed to the firm's preservation—there is no satisfactory proof that the firm is worth more today than it was when the parties married. The income generated by the firm went to pay taxes, debts, mortgages on mari-

tal property, and other items from which both parties benefitted, making it nearly impossible to say that Mr. Quillen should account for some of that income as marital property. We are satisfied that the chancellor properly dealt with Mr. Quillen's law practice and the income generated by it during the marriage.

### c. Other Issues Involving the Division of the Marital Property

■ Ms. Wright asserts that Mr. Quillen should be responsible for the payment of all taxes, interest and penalties for tax debts that accrued before the marriage, and that she should have been awarded a $141,000 account at J.C. Bradford.

■ Viewed in isolation these arguments have some appeal. Again, however, we do not isolate the separate items in the marital estate. We look at the total award and apply the factors listed in Tenn.Code Ann. § 36–4–121(c) in judging whether the division was equitable. In this case the chancellor awarded Ms. Wright property having a net value of approximately $1,543,000. Mr. Quillen was awarded property having a net value of approximately $1,162,000, including the $500,000 payment for his share of Wright Travel. In addition the court refused to order Mr. Quillen to repay Wright Travel approximately $145,000 in loans. Even if we conclude that the taxes paid were paid with marital property and that Ms. Wright has a stronger claim to the J.C. Bradford account, we cannot say that the ultimate division of the marital estate was inequitable.

### IV. Alimony

■ The chancellor awarded Mr. Quillen $3,000 a month as permanent alimony. Ms. Wright argues that the alimony should be eliminated altogether or should be made temporary and rehabilitative. Mr. Quillen argues that the amount awarded was too low.

The terms "temporary" and "rehabilitative" are from the statute, Tenn.Code Ann. § 36–5–101(d), which says that alimony awards should comply with those restrictions whenever possible. But the statute also lists eleven other factors to be considered in mak-

ing periodic alimony awards. The courts have consistently said that the two most important factors are the need of one spouse and the ability of the other spouse to meet that need. *Fisher v. Fisher*, 648 S.W.2d 244 (Tenn.1983). Ms. Wright argues that Mr. Quillen has not shown that he has a need for the alimony awarded by the court. See *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn.App. 1987).

There is another consideration, however, to be taken into account. We have said that the combined purpose of the division of the marital property and the award of periodic alimony is to avoid placing one spouse in a financial position worse than the one existing prior to the divorce. *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn.App.1987); *Duncan v. Duncan*, 686 S.W.2d 568 (Tenn.App.1984); *Shackleford v. Shackleford*, 611 S.W.2d 598 (Tenn.App.1980).

Taking all these factors into account, we think the chancellor was justified in making the alimony award to Mr. Quillen. Considering the standard of living the parties enjoyed during the marriage, Mr. Quillen's age, the fact that his earning capacity will inevitably decline much sooner than Ms. Wright's, the fact that he will no longer enjoy the $25,000 worth of free travel he previously enjoyed, and Ms. Wright's superior earning capacity, we think the amount and the duration of the award was proper.

### V. Property Transferred to Ms. Wright by Mr. Quillen During the Marriage

During the marriage Mr. Quillen transferred (or had transferred) three separate parcels of property to Ms. Wright. The value of the three properties amounted to $72,000. The chancellor found that these parcels remained Mr. Quillen's separate property.

The largest of the three properties (referred to in the record as the Jefferson County, or the Cocke County, farm), was titled in the name of Jean Quillen, Mr. Quillen's second wife, until 1986 when she conveyed it to Ms. Wright. Mr. Quillen had quitclaimed any interest he had in the property to Ms. Wright in 1983. The jury did not believe Mr. Quillen's contention that he con-

veyed the property to Ms. Wright to allow her to obtain a bond. Instead, the jury found the property was conveyed to Ms. Wright to keep it out of Mr. Quillen's name.

The facts with respect to the other two parcels are not quite as clear in the record and the chancellor's written memorandum only refers to the Jefferson/Cocke County farm. Nevertheless, the final decree awarded all three parcels to Mr. Quillen as his separate property.

Ms. Wright insists that the three parcels are her separate property. The chancellor found that with respect to the Jefferson/Cocke County farm Mr. Quillen originally owned it and conveyed it away but did not intend for the ownership interest to pass to the grantee. This conclusion is buttressed by the jury finding that the property was conveyed to Ms. Wright to keep it out of Mr. Quillen's name.

The courts have not looked favorably on transfers to hinder or defraud creditors or to avoid the payment of taxes. In *Best v. Best*, 773 S.W.2d 260 (Tenn.App.1989), this court applied the clean hands doctrine to defeat an attempt by an ex-husband to recover the title to property he had placed in his ex-wife's name at the time of the divorce. The purpose of the conveyance to the wife was to protect the property from the husband's creditors and from Internal Revenue Service claims. See also *McCallie v. McCallie*, 719 S.W.2d 150 (Tenn.App.1986) and *Thomas, et al. v. Hedges, et al.*, 27 Tenn.App. 585, 183 S.W.2d 14 (1944).

Without retreating from the rule cited in those cases, however, we think that in the context of this dispute the chancellor's ruling should not be disturbed. We must remember that we are looking at the overall settlement in a divorce action involving large amounts of property. One of the items to be considered in arriving at an equitable distribution of the marital property is the separate property of each party. Tenn.Code Ann. § 36–4–121(c)(6). We must conclude that the chancellor's decision on how to divide the marital property was made with the knowledge that the $72,000 represented by these three parcels of property was on Mr. Quil-

len's side of the ledger. We cannot conclude that he would have made the same disposition of the marital property if the $72,000 has been on Ms. Wright's side—a net shift of $144,000. Therefore, while we might quibble with the legal niceties involved in condoning what appears to be inequitable behavior, we think any error was harmless because the chancellor balanced the accounts in his division of the marital property.

## VI. Child Support

In the final decree the chancellor ordered Mr. Quillen to pay $1,950 per month in child support. The amount was derived from the child support guidelines of the Tennessee Department of Human Services. Mr. Quillen argues that the court should have deviated from the guidelines because of the limited visitation rights he has and the disparity between his income and that of Ms. Wright's.

 We find both reasons unconvincing. The first reason defies logic because the less time the child spends with Mr. Quillen the more he should pay Ms. Wright for supporting the child while the child is in her custody. See Tenn.Comp.R. & Regs. ch. 1240-2-4-.04(b); Nash v. Mulle, 846 S.W.2d 803 (Tenn.1993). The second reason has more appeal but we do not find that the parents' incomes are so disparate that the guidelines are "neither appropriate nor equitable." See Tenn.Comp.R. & Regs. ch. 1240-2-4-.04(5). The guidelines assume that the custodial parent will be spending an equal percentage of net income to support the child. See Tenn.Comp.R. & Regs. ch. 1240-2-4-.03(2). While we might assume that nineteen percent of the combined incomes of the two parties is far more than the child really needs, the record does not support a finding that the chancellor should have deviated from the guidelines.

## VII. The Issues Submitted to the Jury

 Mr. Quillen asserts that the chancellor erred in not submitting all factual issues to the jury—including mixed questions of law and fact. Examples cited in Mr. Quillen's brief of the questions that should have been submitted to the jury include: whether either party dissipated assets; whether the

actions of one party amounted to cruel and inhuman treatment; who should have custody of the child; what amount of alimony should Ms. Wright pay; whether property was marital or separate; whether the parties were tenants in common as to certain property; and whether Wright Travel was a partnership.

 In Tennessee, Art. I § 6 of the Constitution provides that the right to trial by jury shall remain inviolate. The constitution does not mean, however, that the right is absolute. The constitution preserved the right only to the extent it existed at common law. Marler v. Wear, 117 Tenn. 244, 96 S.W. 447 (1906). At common law there was no right to a jury trial in matters inherently equitable. Harbison v. Briggs Bros. Paint Mfg. Co., 209 Tenn. 534, 354 S.W.2d 464 (1962). Since divorce cases were considered to be "in the nature of chancery suits," Richmond v. Richmond, 18 Tenn. 342 (1837), the constitutional right to a trial by jury did not extend to divorce actions. See 24 Am.Jur.2d, Divorce and Separation § 342.

Since an early date in our history, however, parties have enjoyed a statutory right to a jury trial in divorce cases on "matters of fact" charged in the complaint and denied in the answer. Tenn.Code Ann. § 36-4-113. There is also a general statutory right to a jury trial in chancery "to try and determine any material fact in dispute." Tenn.Code Ann. § 21-1-103.

 The right to a jury in an equitable matter is not the common law right guaranteed by the constitution. The right exists only to the extent provided by statute, Third Nat'l Bank v. American Equitable Ins. Co., 27 Tenn.App. 249, 178 S.W.2d 915 (1943), and the jury does not try the whole case or render a general verdict for one party or the other. Id. We believe the same rules apply in a divorce action where a jury has been demanded under Tenn.Code Ann. § 36-4-113.

 In such cases the trial judge has the authority to determine what issues should be submitted to the jury. "He may submit some issues and reserve others," but "He

must not thereby deprive a litigant of the right to have the substantial disputes as to matters of fact passed upon by the jury." *Arrants v. Sweetwater Bank*, 55 Tenn.App. 631, 636, 404 S.W.2d 253, 256 (1965).

It is true that mixed questions of law and fact may be decided by the jury. *State ex rel. Moretz v. City of Johnson City*, 581 S.W.2d 628 (Tenn.1979). In law cases in which the jury usually returns a general verdict it may be necessary to submit all the mixed questions of law and fact to the jury. For instance, questions of negligence and probable cause in malicious prosecution cases are mixed questions of law and fact, yet they are routinely submitted to the jury and the jury returns a general verdict. *See McElya v. Hill*, 105 Tenn. 318 at 325 (1900). But we do not think Tenn.Code Ann. § 36–4–113 requires all mixed questions of law and fact to be submitted to the jury. We think the trial judge has a choice. "Either the court must inform the jury hypothetically whether or not the facts which the evidence tends to prove will, if established in the opinion of the jury, satisfy the allegations, or the jury must find the facts specially, and then the court will apply the law." *McElya v. Hill*, 105 Tenn. 318 at 326 (1900).

In this case, we think the chancellor acted within his discretion in deciding himself how the law applied to the facts. In other words, we do not think Mr. Quillen was denied a jury trial on any of the material facts in dispute. Of the list cited above the one that comes closest to a pure fact question is the question of dissipation of assets. We find, however, that that question was not a material part of this case and the error, if any, in not submitting this question to the jury, was harmless.

### XIII. Mr. Quillen's Right to Represent Himself

The right to represent oneself in a court of law is preserved by statute in Tennessee. Tenn.Code Ann. § 23–1–109. Like the right to a trial by jury, however, it is not absolute. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Courts have the inherent power to supervise and control their own proceedings

and to sanction attorneys for conducting themselves in a reckless manner. *Andrews v. Bible*, 812 S.W.2d 284 (Tenn.1991). "[I]t has traditionally been the province of the courts to set standards for the bar and that an attorney acts not only as a client's representative, but also as an officer of the court and, accordingly, has a duty to serve two masters." *Id.* at 291.

The decision to prohibit Mr. Quillen from representing himself resulted from an altercation that took place during Ms. Wright's discovery deposition. The chancellor found that Mr. Quillen physically attacked Ms. Wright's attorney in the elevator in Mr. Quillen's office building. After a hearing the chancellor found Mr. Quillen in contempt of court and sentenced him to ten days in jail.

We are satisfied that the decision to restrict Mr. Quillen's participation as an attorney in the case was within the trial judge's discretion. While the power should be exercised sparingly, the court's inherent power to supervise and control its own proceedings includes the authority to prohibit a party who is too emotionally involved in his own case from continuing to represent himself.

Mr. Quillen also insists that the chancellor restricted him from effectively participating in the case. From our review of the record we find these contentions to be without merit.

### IX. Mr. Quillen's Attempts to Disqualify Opposing Counsel

On several occasions Mr. Quillen asked the court to disqualify Ms. Wright's counsel from continuing to represent her. The motions were based on allegations that counsel was a witness in the case, that counsel had previously represented Mr. Quillen in a dispute involving Wright Travel, that counsel's continued involvement created the appearance of impropriety, and that counsel had actual conflicts of interest.

The chancellor considered all the motions and found that the proof did not support a decision to disqualify Ms. Wright's counsel. Without reciting the proof in detail we are satisfied that it does not preponderate against the chancellor's findings.

## X. Rule 11 Sanctions Against Mr. Quillen

The chancellor ordered Mr. Quillen to pay Ms. Wright $5,000 for filing "a large number of repetitive and unnecessary motions that have required the court on repeated occasions to consider the same issues based on similar if not identical facts where the law governing such circumstances has not changed." We are satisfied that the chancellor's conclusion is correct, but we fail to find the proof in the record on which he based the amount of the sanction. The original motion for sanctions was filed on April 22, 1993 and it referred to specific motions filed prior to that date. Counsel attached an affidavit stating that he had spent twenty hours responding to the allegedly frivolous motions. He stated he normally charged $150.00 per hour.

The chancellor did not rule on the motion until after the trial, just before the entry of the final decree. We do not find any further proof in the record on this point.

Rule 11, Tenn.R.Civ.Proc., allows trial judges to impose sanctions "which may include an order to pay the other party or parties the amount of the reasonable expenses incurred ... including a reasonable attorney's fee." While the violation of the rule may be obvious in this case, a fee of $3,000 is all that is supported by the record. The judgment for sanctions in the final decree should, therefore, be reduced to $3,000.

We have considered all the other issues raised by the parties and find them to be either immaterial or any alleged errors to be harmless.

The judgment against Mr. Quillen for violating Rule 11 is reduced to $3,000. In all other respects, the chancellor's decree is affirmed. The cause is remanded to the Circuit Court of Davidson County for any further proceedings that may become necessary. Tax the costs on appeal to Mr. Quillen.

TODD, P.J., and CORNELIA A. CLARK, Special Judge, concur.