| | |
|---|---|
| NEIL PRICE, | ) |
| | ) |
|      Plaintiff/Appellant, | ) |
| | )   Appeal No. |
| v. | )   M1998-00840-COA-R3-CV |
| | ) |
| TONI PRICE, | ) |
| | )   Davidson Circuit |
|      Defendant/Appellee. | )   No. 94D-3333 |


COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


THE HONORABLE MARIETTA SHIPLEY, JUDGE

JAMES G. MARTIN, III
GREGORY D. SMITH
Farris, Warfield & Kanaday
424 Church Street, Suite 1900
Nashville, Tennessee 37219
    ATTORNEY FOR PLAINTIFF/APPELLANT


ROBERT L. JACKSON
STANLEY A. KWELLER
Jackson, Kweller, McKinney & Badger
One Washington Square, Suite 103
214 Second Avenue North
Nashville, Tennessee 37201
    ATTORNEYS FOR DEFENDANT/APPELLEE

AFFIRMED IN PART
REVERSED IN PART
AND REMANDED


WILLIAM B. CAIN, JUDGE

# O P I N I O N

This case involves the dissolution of a seventeen-year long marriage. The parties have raised on appeal issues involving spousal support, child support, their partial marital dissolution agreement and attorney fees. Upon a review of the record and the relevant law, we find that the decision of the trial court should be reversed in part and affirmed in part.

## I. Facts

Dr. Neil Price ("the Husband") and Toni Naugle Price ("the Wife") were married in 1981 at which time the Wife had a college degree and the Husband was within weeks of completing medical school. The parties made several moves while the Husband completed his medical education as a specialist in gastroenterology. In July 1987, the parties moved to Nashville where the Husband accepted a job with the Frist-Scoville Medical Group earning $125,000 per year. In January of 1988, the Wife took a job in advertising at $40,000 per year. Later in 1988, the parties purchased a home on Golf Club Lane for $500,000. A few months after purchasing this house, the Wife quit her job. She found another job at $60,000 per year in June of 1989 but left this job after about three months.

In December of 1990, the parties' one child was born. Before the birth of this child, a daughter named Noel, the Wife had decided to go to law school. She began attending the University of Tennessee in Knoxville in the fall of 1992 when Noel was twenty months old. During her first year of law school, the Husband was the primary care giver for Noel during the week and the Wife returned to Nashville to spend the weekends with the Husband and Noel.

In the spring of 1993, while the Wife was in her second semester of law school, the Husband engaged in a brief romantic relationship with a woman who was a friend of the parties and whose mother babysat regularly for the child. Though the Wife did not learn of the affair until 1995 through the Husband's answers to interrogatories, the parties experienced marital troubles much earlier.

The Wife did not return to law school for the 1993-1994 academic year, but instead remained in Nashville. During this time, the parties spent seven or eight months in marital counseling. In August of 1994, the Wife, along with the daughter, moved back to Knoxville to resume her law school education. The Husband bought a condo in Knoxville for the Wife and child to live in while the Wife attended law school. The parties have not lived together since the summer of 1994.

The Husband testified that other than the purchase of their home for $500,000, the evidence established that the parties lived moderately. They had little furniture, they drove medium-priced vehicles, they took annual driving trips to the beach and they did not belong to clubs. The Husband testified that the Wife began to spend more money after he informed her that he was unhappy in the marriage. He claims that in the fall of 1994, she spent $18,000 to furnish the Knoxville condominium including an $11,000 bedroom suite for their young daughter.

The Husband filed for divorce in September of 1994 at which time the parties entered a pendente lite order which required the Husband to continue to pay all of the Wife's expenses including the monthly mortgage payment on the Knoxville condo of $1,817, the costs of tuition, fees and books for the Wife's law school, $5,700 per month for the child's and the Wife's support, $5,000 to be applied to the Wife's attorney fees. In addition, the Husband maintained the monthly payments and utilities on the Golf Club Lane residence until it was sold. At the 1998 trial, the Husband stated that he had been paying between $7,500 and $8,000 per month pursuant to the pendente lite order for more than three years, even though his present take-home pay had declined to $11,000 per month. Except for $5,000 that the Wife earned through temporary employment in the fall of 1997, the Husband provided all of her support before the final divorce. He completely financed the Wife's living and school expenses while she obtained her law degree.

The trial was heard in two segments: the first segment in 1996 and the second in 1998. During the 1996 hearing, after a full day of trial was held but

3

before the case was reconvened to conclude the trial, the parties entered into a Reconciliation Agreement by Order entered September 16, 1996. However, by order entered in June of 1997, the Reconciliation Agreement was set aside and the case was reinstated on the docket for trial. This second and final segment of the trial was heard in March of 1998.

Prior to the 1996 trial, the parties had entered into a Partial Marital Dissolution Agreement (PMDA). This agreement purported to settle all issues involving child custody, visitation, the division of marital property and the responsibility for the payment of debts other than attorney fees. The PMDA specifically included a provision that "each party shall be responsible for paying debts incurred by that party except for attorneys fees and expenses that may be awarded by the court." Following the 1996 Order of Reconciliation, the parties continued to recognize the PMDA as binding. For example, all of the marital assets, including the proceeds from the sale of the Golf Club Lane residence, were divided pursuant to the PMDA. The 1998 Final Decree held that the PMDA was approved by the court and that each provision of it was made an order of the court except as modified by the parenting plan.

At the time of the 1998 trial, the Husband was a partner in the Frist-Scoville partnership and a shareholder of the Nashville Medical Group. His gross salary was approximately $18,244.32 per month plus a $1,000 per month stipend for serving on his company's executive committee for a monthly total of $19,244.32. The parties stipulated that during January and February of 1998, the Husband had received a gross monthly salary of $19,234.46 and that 21% of the net monthly income from that monthly salary was $2,748. The evidence was that the Husband's income from salary had been much higher in 1994 and 1995 during which he made $35,798 per month and in 1995 and 1996 during which he made $27,376 per month. The proof showed that his salary had declined based upon matters out of his control. For example, his firm had hired an additional gastroenterologist, overhead had increased, production by his group had decreased and he was working fewer hours so his schedule could accommodate visitation with an out-of-town child. The president of the Nashville Medical Group Corporation, Dr. Bolds, testified that the Husband's

4

salary was likely to continue to decrease. Dr. Bolds stated that the Husband had no direct participation in setting his salary.

Dr. Bolds testified with regard to recruitment bonuses that were given to doctors in the Nashville Medical Group when the group received new recruits. He said that Dr. Price had received $14,261 in recruitment bonuses in 1996 and $18,352 in 1997 but that he should not expect any such bonus in 1998. The contract had been renegotiated such that the amount of recruitment bonus per new physician had been decreased. The Husband could expect only $3,000 per recruit in the future. In addition, the Husband had received $8,500 in 1996 and $1,000 in 1997 as distributions from the Frist-Scoville partnership. At the time of trial, the undisputed testimony was that the partnership had shown no profit in 1998 and was currently losing money such that distributions in 1998 were unlikely. The Husband testified that another potential source of income for him was from the Independent Practice Association (I.P.A.) which had paid him $1,800 in 1997 and nothing in 1998. Other than his salary, potential recruitment bonuses, and distributions from Frist-Scoville and the I.P.A. should they be profitable, the Husband testified that his only other possible source of income was from speaking engagements which he had done only a couple of times.

According to Dr. Bolds, much of the Husband's income in 1996 and 1997 had come from goodwill payments arising from the sale of the Frist-Scoville Medical Group to Baptist Hospital. Dr. Bolds testified that the Husband had received $32,000 in 1996 and $39,000 in 1997 due to these payments and that he would receive no more payments from the goodwill sale. All of the goodwill payments, including the 1997 payment, were taken into account when the parties divided their assets prior to the 1996 trial pursuant to the PMDA. In addition, the Husband had received $60,000 in 1995 after a reconciliation of the Frist-Scoville capital accounts and this money was also taken into account in the PMDA's asset division.

At the March 1998 trial, the Wife submitted an Income and Expense statement to the court showing regular monthly expenses of $7,575, which included $2,623 in mortgage payments, $1,652 in hotel payments and $2,500 in

legal expenses. The Wife acknowledged that she had spent more than $11,000 for cosmetic surgery in the fall of 1997. When the Wife moved with the daughter to Texas in August of 1997, she moved into a Marriott Hotel where she continued to reside as of the trial date at a cost of $1,652 per month. As of the March 1998 trial date, the Wife had not taken the bar exam and was not yet employed. She testified about a potential job with an insurance company which had also been a potential job a year and a half earlier at the 1996 trial. Her testimony revealed that she had made only minimal efforts to secure a job as well to take the bar exam. In addition to the monthly support of between $7,500 and $8,000 per month that the Wife had been receiving pursuant to the pendente lite order, she had received $208,000 in marital assets by the time of trial.

## II. Disposition by the Trial Court

Following the 1998 trial, the trial court entered a Memo Opinion and a Final Order in which it granted the Wife a divorce on the ground of inappropriate marital conduct. The court approved and adopted the PMDA in all respects except as modified by the Parenting Plan and a provision regarding the preparation and date of a Qualified Domestic Order.

Finding, that the Husband's income at the time of trial was $18,234 per month plus a $1,000 per month stipend for serving on the executive committee, the court ordered the Husband to pay regular child support of $2,800. Of this amount, $2,100 was to paid to the Wife directly and $700 was to be paid into an educational trust. The court specifically ordered that any remainder of the educational trust be paid over to the daughter when she turns twenty-four years of age. Further, the court ordered that in the event that the Husband receives any bonus, 21% of the net proceeds should be paid into the educational trust fund until the fund has received $10,000 in 1998 and 1999 and $13,800 in subsequent years. Any monies from bonuses left over after funding the educational trust will be paid to the Wife for regular child support at 21% of the net rate. The court stated that if the Husband's income increases, the initial amounts over the $2,800 will first be paid into the educational trust until the trust receives the amounts indicated above. Any monies over that amount shall be paid to the Wife directly

as regular child support.  Finally, the court held that if child support is to exceed $3,000 per month, the Husband may request the court to again determine the child support payable to the Wife and into the trust.

With regard to alimony, the court ordered that the Husband should pay rehabilitative alimony until June 1, 2003 at the rate of $4,500 per month through January 5, 1999 and at the rate of $3,500 per month from January 5, 1999 to June 5, 2003.  The court also ordered the Husband to pay periodic alimony from June 5, 2003 until June 5, 2008 at the rate of $2,000 per month.  Finally, the court ordered the Husband to continue to  maintain major medical hospitalization insurance for the Wife.  In setting alimony, the court decided that based on her March 1998 Income and Expense Statement, the Wife's "rock bottom" expenses were $6,633 per month.

Furthermore, the court ordered the Husband to pay $12,000 toward the $23,000 in debts shown by the Wife and to pay Noel's tuition for the 1997-98 academic year.  The court ordered the preparation and entry of a Qualified Domestic Relations Order which would divide retirement benefits as of January 1, 1998.  Lastly, the court ordered the parties to file a joint tax return for 1997 and to divide any refund.

### III. Spousal Support Award

The Husband challenges the trial court's award of alimony contending that it is excessive and unnecessary.  In its final order, the court ordered that the Husband pay rehabilitative alimony at the rate of $4,500 per month from June 5, 1998 to January 5, 1999 and, at the rate of $3,500 per month from January 5, 1999 until June 5, 2003.  In addition, the court ordered the Husband to pay periodic alimony from June 5, 2003 until June 5, 2008 at the rate of $2,000 per month.  Thus,  the court's award amounts to  ten years of support totaling approximately $337,000.  Specifically, the Husband claims that the court erred by awarding "closing in" alimony in the absence of a finding that the Wife is not able to be economically rehabilitated and by wrongly equating economic rehabilitation with economic parity.  Also, the Husband notes that the court

awarded the Wife more than she needs even by her own assessment of her need.

Trial courts are given broad discretion in determining the nature, amount and duration of a spousal support award. *Wilson v. Moore*, 929 S.W.2d 367, 375 (Tenn. Ct. App. 1996). These decisions are factually driven and are guided by the statutory factors set out in Tenn. Code Ann. § 36-5-101(d)(1). *See Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994). Accordingly, the appellate courts are disinclined to alter alimony awards unless they are not supported by the evidence or are contrary to the public policies reflected in the applicable statutes. *Id.*; *see also Young v. Young*, 971 S.W.2d 386, 390 (Tenn. Ct. App. 1997); *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988).

The legislative preference for temporary, rehabilitative support over long term support is embodied in § 36-5-101(d)(1) of the Tennessee Code:

> It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient.

As this court has stated, "[t]he purpose of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient. . . . [while t]he purpose of long-term spousal support . . . is to provide support to a disadvantaged spouse who is unable to achieve some degree of self-sufficiency." *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998); *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998).

The supreme court has articulated the policy that though "alimony is not intended to provide a former spouse with relative financial ease, . . . alimony should be awarded in such a way that the spouses approach equity." *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995). However, this court has noted that

"[w]hile divorced couples often lack sufficient income or assets to enable both of them to retain their pre-divorce standard of living, . . . the obligor spouse may be able to provide some "closing in money" to enable the disadvantaged spouse to approach his or her former financial condition." *Anderton*, 988 S.W.2d at 682 (citing *Aaron*, 909 S.W.2d at 411); *see also Kinard*, 986 S.W.2d at 234-35.

When determining an appropriate amount of alimony to award a party, the court shall consider all relevant factors including:

> (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
> (C) The duration of the marriage;
> (D) The age and mental condition of each party;
> (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
> (G) The separate assets of each party, both real and personal, tangible and intangible;
> (H) The provisions made with regard to the marital property as defined in § 36-4-121;
> (I) The standard of living of the parties established during the marriage;
> (J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
> (L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d) (1996).

The courts have consistently held that the two most important considerations are the need of one spouse and the ability of the other spouse to meet that need. *Wright v. Quillen*, 909 S.W.2d 804, 812 (Tenn. Ct. App. 1995) (citing *Fisher v. Fisher*, 648 S.W.2d 244 (Tenn.1983)). Despite the fact that fault is a factor in the determination of an alimony award, *see* Tenn. Code Ann. § 36-5-101(d)(1)(K), alimony decisions are not intended to be punitive. *Lindsey v. Lindsey*, 976 S.W.2d 175, 179 (Tenn. Ct. App. 1997). At the same time, the court has articulated the policy that "[a] wife whose marriage has been shattered by her husband's misconduct should not be left in a financial condition inferior to her economic situation prior to the parties' divorce." *Young v. Young*, 971 S.W.2d 386, 391 (Tenn. Ct. App. 1997) (citing *Aaron*, 909 S.W.2d at 410-11).

The trial court awarded spousal support for a ten-year period evincing a determination that rehabilitation is feasible for the Wife. We agree that the evidence supports a conclusion that the Wife is capable of self support and thus find that an award of temporary, rehabilitative support is appropriate under the circumstances of this case. The Wife is currently forty-five years old. She has a law degree from the University of Tennessee and was planning to take the Texas bar exam at the time of the appeal. She has some brief work experience in the advertising field. Though the Wife had no job at the time of the 1998 trial, her own testimony revealed that she had made very little effort to find employment. With proper diligence, the Wife should be able to secure adequate employment to support herself.

A review of the Husband's ability to pay and the Wife's need support a conclusion that this is an appropriate case for an amount of alimony which assists the Wife in closing in on her former lifestyle for a time. As will be discussed later, the Husband's gross income from salary at the time of trial was $19,234 per month. The Husband has not disputed that he is currently able to pay support as awarded. However, he specifically has taken issue with the amount of alimony awarded claiming it exceeds the Wife's calculated needs.

The Wife presented several statements of her expenses which, while similar, were not identical. The trial court relied on her March 1998 Expense

Statement which showed that she has $7,853 in monthly expenses. In its Memorandum Opinion, the court found that the Wife's rock bottom expenses were $6,633. The court arrived at this figure by calculating about $2,500 to $3,000 per month for housing expenses, adding $100 for utilities and reducing the Wife's calculated expenses for insurance, clothing, laundry, cleaning services, beauty shop services, maid service, newspapers and periodicals, pets and miscellaneous. Though the trial court did not specify how much it subtracted for each of these expenses, we agree with its conclusion that certain of the Wife's calculated expenses were excessive. For example, among the Wife's projected needs were $500 per month for her clothes, $200 per month for beauty shop expenses and $280 per month for maid services. We therefore hold that the court did not err in finding that $6,633 was the more appropriate sum of the Wife's expenses in order for her to maintain the standard of living established during the marriage.

The court found that the Wife's immediate earning potential was $30,000 per year for 1998 and $55,000 per year for the following years. The lower figure, $30,000 per year, equates to $2,500 per month and the higher, $55,000, equates to $4,583 per month in income for the Wife. The Husband argued that even the lowest salary, $2,500 per month, once added to the $2,550 per month that the Wife was receiving for child support, amounted to an income of $5,050 which is only $1,583 per month less than her $6633 need. However, the problem with the Husband's argument is that he considers child support as income when the $6,633 expense figure does not include the child's expenses. The child support is not at issue in this appeal and our review of alimony should be based only upon the Wife's expenses and the Wife's income. Thus, the actual shortfall here is either $4,133 ($2,500 in job income subtracted from $6,633 in expenses) or $2,050 ($4,583 in job income subtracted from $6,633).

At present, the Wife received $4,500 per month for six months until January of 1999 at which point she began receiving $3,500 per month, the amount she currently receives under the trial court's order. We uphold the court's award of $4,500 per month for six months and $3,500 per month up until this point finding this an appropriate amount of alimony to meet the Wife's needs

11

and aid her "close-in" on her former lifestyle as she has entered the work force. However, by now, the Wife has been out of law school for two and a half years and should be able to receive an increased salary thus decreasing the amount of alimony she will need. Therefore, at the time this opinion is filed, alimony should be modified to $2,000 per month and shall be paid at that rate through December of 2008.

As the trial court found, the Wife "will never approach [the Husband's] earning capacity, barring some entrepreneurial expertise." An award of $2,000 per month in alimony for this duration will enable the Wife to approach financial equity with the Husband during the time that she has a minor child at home. Our conclusion that the Wife is entitled this duration of alimony is consistent with the statutory factors including not only the parties' differing earning capacities and levels of work experience but also the seventeen-year duration of this marriage and the fact that the Husband's fault was grounds for the divorce.

## IV. Child Support

Finding that the Husband's income at the time of trial was $18,234 per month plus a $1,000 per month stipend for serving on the executive committee, the court ordered the Husband to pay regular child support of $2,800. Of this amount, $2,100 was to be paid to the Wife directly and $700 was to be paid into an educational trust. The court specifically ordered that any remainder of the educational trust be paid over to the daughter when she turns twenty-four years of age. Further, the court ordered that in the event that the Husband receives any bonus, 21% of the net proceeds should be paid into the educational trust fund until the fund has taken in $10,000 in 1998 and 1999 and $13,800 in subsequent years. Any monies from bonuses left over after funding the educational trust will be paid to the Wife for regular child support at 21% of the net rate. The court stated that if the Husband's income increases, the initial amounts over the $2,800 will first be paid into the educational trust until the trust receives the amounts indicated above. The court directed that any fund over that amount shall be paid to the Wife directly as regular child support. Finally, the court held that if child support exceeds $3,000 per month, the Husband may request the court to again

12

determine the child support payable to the Wife and into the trust.

A.

The Husband does not challenge the $2,800 amount of child support awarded by the court. However, he insists that the court erred in ordering child support to be paid based on a percentage of his future bonuses. The Wife concedes and we agree that the law is clearly in the Husband's favor on this issue.

In *Lovan v. Lovan,* No. 01A01-9607-CV-00317, 1997 WL 15223 (Tenn. Ct. App. 1997), this court first addressed the issue of whether a trial court could base its child support award upon a percentage of the husband's future income. In addition to setting child support at $1,783 per month, the trial court had ordered the husband to pay a sum equal to 32% of any income received from his business interests in excess of $96,000 per year. The court vacated the lower court's child support award holding:

> We believe that the trial court exceeded its authority in ordering an automatic adjustment in child support based upon a percentage of the husband's future income as determined by his income tax return. While the child support guidelines create a rebuttable presumption as to the correct amount of child support, based upon the obligor's income, Tenn.Code Ann. § 36-5-101(a)(2)(A) only authorizes the courts to provide for the future support of a spouse or of the children "... by fixing some *definite amount* or amounts to be paid in monthly, semimonthly or weekly installments, or otherwise, as circumstances may warrant...." (emphasis added).
>
> Such a definite obligation provides the dependent children with a predictable amount of support, and enables the obligor to shoulder a known burden. If the obligor's income should increase or decrease substantially, then either party may apply to the court for a modification of the child support obligation. In view of the existence of a well-established mechanism for adjustment of child support, the court's action, although well-intentioned, amounts to an extension of its authority beyond the mandate of the legislature.

*Lovan,* 1997 WL 15223 at *4-5; *see also Robertson v. Robertson,* No.

13

03A01-9711-CV-00511, 1998 WL 783339 (Tenn. Ct. App. 1998).

In *Smith v. Smith*, No. 01A01-9705-CH00216, 1997 WL 672646 at *2 (Tenn. Ct. App. 1997), the court cited *Lovan* to overturn a lower court's child support award which was calculated, in part, based on "32% of any future bonus or commission" of the obligor parent. This court held that the lower court should have averaged the commission and bonus amounts in with the obligor parent's salary in order to establish a definite amount of child support. The Wife now relies upon this holding from *Smith* in asserting that the Husband's monthly income for the years before trial should be averaged in order to determine the appropriate amount of child support.

There is no doubt that an average of the Husband's varying amounts of monthly salary from the two years before trial would yield a higher number upon which to base the award of child support. However, the evidence was not that the Husband had fluctuating income levels. Rather, it was that he had experienced a decrease in income due to several legitimate factors. He was receiving a smaller salary because, among other reasons, his group had hired an additional gastroenterologist, the overhead for his practice was higher and the production by his group had decreased. The Frist-Scoville Partnership and the Independent Practice Association were not making distributions as they were not currently turning a profit. The Husband could expect at most $6,000 in recruitment bonuses for the next year. The trial court based its award on the Husband's gross salary at the time of trial and we find that the evidence supports a conclusion that the trial court's $2,800 per month child support award was based upon an accurate determination of the Husband's income as of March 1998. We therefore affirm this child support award.

B.

The next issue involves the disposition of any trust assets which might remain after the child receives an education. The court ordered that the child be the recipient of any funds in the trust at the time she turns twenty four years of age. The Husband argues that the court's order violates the purpose of child

14

support which is to provide for the support and maintenance during minority. *See Garey v. Garey*, 482 S.W.2d 133 (Tenn.1972). We agree. Addressing this same issue, this court in *Lee v. Askew*, No. 02A01-9805-JV-00133, 1999 WL 142389 (Tenn. Ct. App. 1999), held that the remainder of funds from an educational trust belongs to the one who funded the trust. The court reasoned that "the Court has no authority to advance a perceived inheritance to a child or confiscate a parent's assets on behalf of a child." *Id.* at *2.

We thus modify the court's order such that any remainder of the trust be turned over to the Husband who had funded the trust. Thus, in the event that any funds remain in the trust upon the child's twenty-fourth birthday, they shall be paid to the Husband. In so holding, we note that in the PMDA which was adopted in the final decree, the Husband has agreed to be responsible for the costs of tuition , fees and books not covered by an educational fund for the parties' daughter to attend four years of college.

## V. The Partial Marital Dissolution Agreement

The parties entered into the PMDA on July 2, 1996, immediately prior to the 1996 trial which began on the same day. This agreement addressed issues involving child custody, visitation, the division of marital property and the responsibility for the payment of debts other than attorney fees. Among its other provisions, the PMDA provided that "each party shall be responsible for paying debts incurred by that party except for attorneys fees and expenses that may be awarded by the court." The 1996 trial was cut short due to the parties' resolution to reconcile and an order of reconciliation was entered on September of 1996. However, the parties were obviously unsuccessful and they returned to trial in March of 1998 at the end of which the 1996 PMDA was approved by the court in the final decree of divorce. On appeal, the Husband claims that certain aspects of the trial court's final ruling disregard the parties' agreement in the PMDA.

Specifically, the Husband challenges that part of the final order requiring the Husband to pay $12,000 of the Wife's $23,000 in debts incurred

after the execution of the PMDA and that part requiring the Husband to pay private school tuition for the parties' daughter for the 1997-98 academic year. The Husband also takes issue with the requirement that the parties file a joint 1997 federal income tax return. The Husband argues that all three of these provisions in the final order contradict the agreement in the PMDA that each party should be responsible for his or her own debts. In addition, the Husband contends that the final order, by providing that the account be divided as of January 1, 1998, ignores the PMDA's provision that the Husband's retirement account be divided as of June of 1996. Finally, the Husband disagrees with the final order's provision that he maintain major medical insurance for the Wife until she is offered equivalent insurance at her place of employment and that he be responsible for the cost of the premiums in excess of $250 per month. He claims that this conflicts with the PMDA under which he was required to maintain insurance on the Wife no later than June 1, 1998.

The problem with the Husband's position that the PMDA governs the preceding matters is that the parties entered an unanticipated two-year period of reconciliation following the execution of the PMDA. We find only one Tennessee case addressing this issue of the effect of reconciliation upon a marital dissolution agreement. *See Martin v. Martin*, 733 S.W.2d 883 (Tenn. Ct. App. 1987). In *Martin*, the parties had entered an oral MDA and fully executed the terms of the MDA in contemplation of an imminent divorce. However, once the division of the marital property had been made, the parties continued to live together for another five years before obtaining a divorce. This court held that "the evidence is that the agreement did not purport to conclude the marital rights in the event there was a reconciliation. The agreement purported only to divide the property if there was a divorce at that time." *Id.* at 885. Therefore, the trial court was correct in equitably dividing the marital property that had been acquired by the parties subsequent to the MDA but before the divorce.

The rationale of *Martin v. Martin* is applicable to the issue in the case at bar. At the time that the parties entered into the PMDA, they anticipated that trial and divorce were impending. However, almost two years passed during which the parties attempted to salvage their marriage but at the end of which the

16

parties finally obtained a divorce. The parties intended that the PMDA resolve their marital rights only under the circumstance of imminent divorce. We therefore uphold the trial court's award with regard to debt incurred and the retirement benefits accrued after July 2, 1996. We also affirm the court's order relating to payment of the insurance premiums for the Wife and the 1997-98 school tuition for Noel. However with regard to the portions of the PMDA already executed, we hold that the agreement stands. *See e.g. Peterson v. Peterson*, 583 S.W.2d 707, 709-11 (Ky. Ct. App. 1979); *Case v. Case*, 325 S.E.2d 661, 663-64 (N.C. Ct. App. 1985); *Kaminsky v. Kaminsky*, 364 S.E.2d 799, 801-02 (W. Va. 1987) (holding the majority view that the reconciliation of divorcing parties abrogates their settlement agreements as to executory provisions of the agreement only). *See also Crawford v. Crawford*, 392 S.E.2d 675, 679 (S.C. Ct. App. 1990) (holding that the public policy of the state recognizes that reconciliation of parties to a divorce nullifies the provisions of a separation agreement in which they have agreed not to be liable for one another).

Finally, we note that the trial court adopted the PMDA stating that "every provision of said [PMDA] shall be, and is hereby, made an Order of the Court except as modified by the Parenting Plan attached hereto which incorporates subsequent Orders regarding visitation and the provision contained in this Order regarding the preparation of a Qualified Domestic Relations Order." It is clear that certain provisions in the Final Decree are not in accord with the PMDA. To the extent that this is true, we find that the PMDA is further modified by the final judgment to rectify these inconsistencies. The judgment of the trial court in this respect is affirmed.

## VI. Attorney Fees

In the final order, the trial court awarded the Wife $5,000 in attorney fees stating that this amount "would be approximately one-half of a high, but reasonable attorney's fee." On appeal, the Wife requests that this court award her $43,739 in attorney fees to keep her from dissipating her assets. Pursuant to the authority of Tennessee Code Annotated § 36-5-103(c), courts have wide

discretion in awarding attorney fees, and this court will not interfere in the exercise of that discretion in the absence of a clear showing of abuse. *See Salisbury v. Salisbury*, 657 S.W.2d 761, 770 (Tenn. Ct. App. 1983). The trial court's award with regard to attorney fees need only be just and equitable under the circumstances. *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992).

In its Memo Opinion, the trial court clearly communicated its exasperation with what it considered to be excessive fees. After stating that it had "thoroughly reviewed the attorney's fees affidavits of" the Wife's attorney, the court pointed out certain "glaring excesses." The court concluded that while a party could choose to spend its own money in this way, the court would not require the other party to pay for such excessive fees. Under the circumstances of this case, we do not find that the trial court abused its discretion in awarding the Wife only $5,000 toward her attorney fees.

In addition, we find that the Wife is not entitled to attorney fees incurred in the appeal of this case. This court has the authority to award attorney fees for legal services rendered on appeal. *Seton v. Seton*, 516 S.W.2d 91 (Tenn.1974). This appeal has resulted in a reversal of the trial court's holding with regard to several issues. To this extent the Husband has prevailed. Therefore, we find that each party shall be responsible for his or her own attorney fees on appeal.

## VII. Conclusion

The trial court's decision is affirmed in part and reversed in part. With regard to spousal support, the decision of the trial court is modified such that from the time this opinion is filed through December of 2008, alimony shall be paid to the Wife at the rate of $2,000 per month. With regard to child support, we affirm the court's order that the Husband pay $2,800 per month, $2,100 to the Wife and $700 to an educational trust. However, we reverse the order that the Husband pay a percentage of his future earnings finding this is contrary to statutory law. We find that the final decree does not violate the PMDA but rather supplements it as that agreement purported to divide the parties' property

and assign their financial responsibilities only in contemplation of imminent divorce. Finally, we affirm the trial court's award of only $5,000 to the Wife in attorney fees and we deny the Wife her request for attorney fees on appeal. The costs of this appeal shall be divided equally between the parties.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE

_____
PATRICIA J. COTTRELL, JUDGE