IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 24, 2012 Session

## WENDY ANN BURTON v. ROBERT MARK MOONEYHAM

**Appeal from the Chancery Court for Sumner County**
**No. 2006D98     Tom E. Gray, Chancellor**

**No. M2011-00909-COA-R3-CV - Filed March 28, 2012**

In this divorce appeal, husband challenges the trial court's valuation of his business, the division of marital assets, and the allocation of the debt on the marital residence. Husband also argues that the trial court erred in the amount and length of the alimony award and in awarding attorney fees to wife. We find that the trial court erred in changing its net valuation of the business, after a second hearing, from $200,000 to $280,000 based upon the updated status of Husband's payments on the tax lien. As this change did not affect the trial court's division of the marital estate or the alimony award, however, the error is harmless. In all other respects, we find no error in the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Stanley Allen Kweller, Nashville, Tennessee, for the appellant, Robert Mark Mooneyham.

David Scott Parsley, Joshua G. Strickland, and Michael K. Parsley, Nashville, Tennessee, for the appellee, Wendy Ann Burton.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Wendy Ann Burton ("Wife") and Robert Mark Mooneyham ("Husband") were married in 1985 and have one child, who is now emancipated. Wife filed for divorce in March 2006 on grounds of inappropriate marital conduct; Husband counterclaimed alleging inappropriate marital conduct.

The case was tried on November 3, 2010, and the court heard testimony from Husband, Wife, and several other witnesses. Husband presented expert testimony from Kurt Myers concerning the value of his business. The court granted Wife a divorce on grounds of inappropriate marital conduct. In a memorandum opinion filed on November 30, 2010, the court identified and valued the marital estate as follows:

1. Improved real property known as 605 Bay Pointe Drive, Gallatin, TN 37066. This real property is encumbered by home equity line of credit in the amount of $150,000.00. Tax assessed value: $435,000.00 which is pre-recession;

2. Advantage, Inc. doing business as Access Car Rental value: $550,000.00 with a tax lien of $350,000.00;

3. Life insurance policies;

4. Household goods and furniture, value: $25,000.00, which includes furniture and furnishings at [605] Bay Pointe Drive, Gallatin, TN 37066 and that is the residence of James Mooneyham;

5. Savings account in name of wife: $20,000.00;

6. Checking account in name of wife;

7. Checking account in name of husband.

The court awarded Wife the marital residence as well as the household goods in her possession and her savings and checking accounts. The court awarded Husband his business, Access Car Rental, as well as the household goods in his possession, his checking account, and a life insurance policy in his name. The court ordered Husband to pay the home equity line of credit on the marital home and the IRS debt.

In its memorandum, the trial court also found that Wife had financial need and Husband had the ability to pay alimony. The court awarded Wife alimony in futuro in the amount of $4,000.00 per month. Wife was also awarded alimony in gross (alimony in solido) in the amount of $24,904.95 for attorney fees.

Husband filed objections to a proposed final decree submitted by Wife, and Wife filed a motion for clarification of the court's ruling and a motion to alter or amend or to clarify ruling as to the indebtedness on the marital residence. These matters were heard by the court

on March 3, 2011; Husband, Wife, and Mr. Myers testified at this hearing. In an order entered on March 28, 2011, the court found that it had made an error in its memorandum opinion with regard to the indebtedness on the marital residence. The court stated:

> The Court finds that it made an error relative to the $150,000.00 [line of credit] because it was included in the indebtedness which had a principal balance of $269,546.55 as of September 27, 2010. The line of credit has been blended into the mortgage on the real property, in which the Court finds Ms. Burton signed off on the Deed of Trust. The Court finds that it stays with the value of the home at $435,000.00. It is subject to the mortgage balance of $269,546.55, which would leave equity of $165,453.45. The Court further stays with its previous Memorandum Opinion that the value of the business is $550,000.00 and that it has a $250,000.00 to a $270,000.00 IRS lien[1] on the corporation. There is equity in that business of $280,000.00.

To reflect this change with regard to the debt on the marital residence, the court made changes to the alimony award:

> [I]t was the intent of the Court in its Memorandum that Mr. Mooneyham would pay off the $150,000.00 debt owed on the residence awarded to Ms. Burton which debt was incurred for the business awarded to Mr. Mooneyham, and that if he did such then that would leave a little over $100,000.00 that would still be owed on the real property. The Court in its modification makes modification of the alimony, and the Court orders that the alimony shall be . . . $5,847.00 per month until death, remarriage, or the debt on 605 Bay Pointe Drive is reduced by $150,000.00. If the $150,000.00 was paid off, it would leave $119,546.00 on the residence. It is ORDERED, ADJUDGED AND DECREED that the Memorandum shall be modified to the alimony in futuro award is $5,847.00 per month, and retroactive back to the first day of December, 2010. Once the $150,000.00 has been paid by Mr. Mooneyham on the mortgage on the residence awarded to Ms. Burton, then the alimony shall revert to $4,000.00 per month subject to the death of either party or the remarriage of the recipient.

The court's final decree of divorce was entered on May 13, 2011. The order recites the court's decrees from the November 3, 2010 hearing and then sets out the provisions of the court's order from March 28, 2011.

---

[1]The lien had been paid down somewhat since the court's memorandum opinion.

ANALYSIS

Husband appeals the trial court's decision with respect to the division of the marital estate, the amount and length of alimony, and the award of attorney fees to Wife.

1.

As to the division of the marital estate, Husband argues that the trial court erred in its valuation of his business, in the division of the marital assets, and in the allocation of the debt on the marital home.

*Valuation of business*

Husband asserts that the trial court misconstrued the testimony of the only business valuation expert to testify and incorrectly valued Husband's business. As set out above, the trial court found that Husband's business was worth $550,000 with a $270,000 IRS lien, leaving equity of $280,000.

The valuation of a marital asset is a question of fact. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). Each party bears the burden of producing competent evidence regarding the value of a marital asset. *Id.*; *Wallace v. Wallace*, 733 S.W.2d. 102, 107 (Tenn. Ct. App. 1987). If the evidence of value is conflicting, the trial court has discretion to assign a value that is within the range of values supported by the evidence. *Kinard*, 986 S.W.2d at 231. A trial court's valuation of a marital asset will be given great weight on appeal and will not be overturned unless the evidence preponderates against those findings. *Smith v. Smith*, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002); *Kinard*, 986 S.W.2d at 231.

Husband's business is a closely held corporation. This court has previously recognized that "determining the value of a closely held corporation is not an exact science, and the courts have not articulated a consistent approach to the problem." *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App.1995) (citing *Wallace*, 733 S.W.2d at 107). The method or combination of methods used to determine value "depends upon the unique circumstances of each corporation." *Wallace*, 733 S.W.2d at 107.

In order to evaluate the trial court's valuation, we must examine the pertinent evidence presented to the court. At the trial in November 2010, Husband testified about his car rental business, Advantage, Inc., doing business as Access Car Rental ("Access"); the business was incorporated in 1996, and Husband was the sole stockholder. According to Husband, Access had not been doing well financially since 2006 due to changes in the car industry and the

-4-

overall state of the economy. He explained that Access depended upon large lines of credit with several lenders in order to maintain its inventory of cars. Husband testified that he generally paid himself around $12,000 a month. On cross-examination, Husband acknowledged that he paid his mother a weekly salary and gave her a free car although she no longer worked at Access; he further admitted that he provided his adult son with a car and paid for some personal expenses using Access accounts.

Husband's personal tax returns from 2006 through 2009 were admitted into evidence.[2] The returns show negative total income figures (losses) ranging from $207,031 (in 2008) to $684,121 (in 2009). While the returns show S corporation income (from Access) of $34,987 in 2008, this was offset by prior year net operating losses of $242,018. Similarly, in 2006, S corporation income of $16,325 was offset by prior year net operating losses of $271,096. The returns for the other two years show only losses. Husband testified that he had not paid the company's portion of the employees' payroll taxes for some quarters, and the Internal Revenue Service had placed a lien for $439,278.15 against Advantage, Inc. in December 2009. Husband offered the following explanation:

> I just borrowed money. Basically it was a loan and I should have paid the taxes, but I couldn't pay them because I'd either have to pay my employees, my rent, my lenders, Wendy or myself, or go home. I mean I just had to make a decision.

Since December 2009, the company had been making payments on the tax lien. At the time of the November 2010 hearing, Advantage still owed $359,145.84 to the IRS.

Husband called Mr. Myers, a certified public accountant and certified business appraiser, as an expert to testify as to the value of Access. Mr. Myers detailed the financial statements and other documents he reviewed and testified that he interviewed Husband and his CPA. When asked about his opinion as to the value of the business in the summer of 2009, Mr. Myers testified that based on the financials through the end of 2008, he concluded that the business value at that time was approximately $200,000. Mr. Myers explained the various approaches that could be used to value a business. Because Access "did not have any earnings or positive cash flow," Mr. Myers determined that the company could not be valued using the income approach. He decided to use the asset approach. Mr. Myers went through an explanation as to how he had made adjustments to the numbers provided to him by Husband and Access. After making adjustments, he concluded that the value of the company

---

[2]Husband testified that, since Advantage, Inc. was an S corporation, the company's profits flowed through as income to him. Advantage tax returns for the years 2001 through 2009 were also admitted into evidence.

was $550,000; but there was also a $350,000 tax lien, which resulted in a net value of $200,000 as of the end of 2008.

Under questioning by Husband's counsel concerning personal expenditures not reflected in the company's books, Mr. Myers testified that, under the asset approach to valuation, these expenditures would not change the valuation. Mr. Myers was asked whether he could value Access as of the date of the hearing:

Q. Do you have an opinion, Mr. Myers, in a reasonable degree of accounting certainty of business valuation as to the value of the business known as Advantage, Inc., doing business as Access Car Rental, as of today?

A. It would be difficult for me to say because I have not done all of the analysis that I did at December of 2008.

Q. Okay.

A. Based on the numbers that I have looked at on the financials through 2010 and the tax return for 2009, and assuming that the tax lien is still in existence,[3] I don't know if it is or not, but assuming those things are in existence it would have no value. I mean it would be a negative. But in terms of giving an opinion on a business value, you really can't have a negative value. So it would have to be no value.

Q. And as of 2008 when the business was—at the end of 2008 when you and Mr. Bright [accountant hired by Wife] compared your notes the figure was $200,000.00; is that correct?

A. That's correct.

Q. And it wouldn't have improved any since then?

A. Not based on the financial statements that I have seen.

Mr. Myers testified that he had not been given complete financial statements for 2009 and had received the tax return for that year the week before the hearing.

---

[3]At the time of the hearing, the balance owed on the tax lien was still about $350,000.

At the March 2011 hearing on the various post-trial motions, the court heard additional testimony from Mr. Myers. Husband's counsel asked Mr. Myers questions to clarify his previous testimony:

Q. The Judge's Memorandum says the business was worth $550,000.00, less a tax lien of $350,000.00. Subtracting it and therefore giving it a value—He didn't say this, but I am going to take it to the next step of $200,000.00. First, is it your opinion that the business was worth $550,000.00, regardless of the tax lien, on November the 1st or 2nd, 2010 when we tried this case?

A. No, it's not. My opinion was that the value—the date we were looking at at the time was December 31st, 2008. At the time we looked at the value. The value at that time was $200,000.00. The tax lien had not been issued yet. The tax lien was issued, and I don't remember the exact date, I want to say maybe February of 2009. So at that point, you know, we said that the—it was two hundred thousand without consideration for the tax lien. That if you figured in the tax lien it would just be—it would be worthless.

Q. Now, prior to the trial and prior—and after the tax lien was actually issued you got to looking at some updated financial information, correct? That was probably the end of—effective end of 2009 roughly?

A. I believe so.

Q. Had that information, did that change your opinion as to the value of the business either up or down?

A. No, it did not. It just—Two hundred thousand was a low number and the business had not gotten any better. And I didn't see anything in there that would change my mind to say it was worth anything different, other than the inclusion of the tax lien might make it zero.

After hearing Mr. Myers's testimony, the court pointed out the discrepancy between his current testimony and his testimony in November 2010, when Mr. Myers had stated that the $200,000 figure represented the difference between the total value and the $350,000 tax lien.

As we stated above, where there is conflicting evidence concerning an asset's value, the trial court has discretion to assign a value that is within the range of values supported by the evidence. *Kinard*, 986 S.W.2d at 231. Given the conflict between Mr. Myers's testimony

in November 2010 and then in March 2011, we find no error in the trial court's decision to give greater weight to Mr. Myers's original testimony.

Under Tenn. Code Ann. § 36-4-121(b)(1)(A), marital property should be valued "as of a date as near as reasonably possible to the final divorce hearing date." The trial court credited Mr. Myers's testimony as to the value of the business as of December 2008, the time through which the expert had been provided with complete information. Mr. Myers testified that, "It would be difficult for me to say [the value of the business at the time of the November 2010 hearing] because I have not done all of the analysis that I did at December of 2008." While Mr. Myers did answer questions about possible values through 2009, he did not give a firm opinion because he lacked complete information:

> Q. If Mr. Mooneyham's company has made arrangements to repay that debt to the IRS, I assume once that debt was paid your value of the business would increase by $350,000.00? Or am I incorrect?
>
> A. It's possible. You would have to see what financial position the business was in at that time.
>
> Q. Right.
>
> A. Because in theory if he paid three hundred and fifty thousand to get rid of the debt his company would have three hundred and fifty thousand less of cash. So you would just have to know what transpired between point A and point B to the point that it was paid off to know what it would do, whether it would have any effect or not.
>
> Q. Yes, and that's what I thought, because you clearly took it straight off the top when you had a previous value of five fifty, and then you said two hundred. So you took the three hundred and fifty straight off as a debt, but you wouldn't necessarily add the three fifty back on when it was repaid because you would have to evaluate some other factors other than the debt itself being repaid, correct?
>
> A. That's correct. Just like we did at 2008.
>
> Q. Right. But does that not work the same way today when you take it off, sir?
>
> A. Oh, it could, yes.

Q. All right. You didn't do that though, did you?

A. I have only given an opinion on December of 2008.

In light of the expert's testimony that his opinion of the value of Access was as of December 2008, the evidence preponderates against the trial court's decision, after the May 2011 hearing, to use the reduced lien amount as of May 2011 instead of the lien amount used in the expert's original calculations. As the expert testified, the value as of the time of a reduced lien amount would depend upon the overall financial status of the company at that time. We, therefore, conclude that the proper net value for Husband's business was $200,000. Since the trial court did not change the division of marital assets or the alimony award based upon the new lien balance, we need not remand for reconsideration of the division of marital assets on that basis.

*Debt on marital residence*

Husband argues that the trial court erred in determining that all of the debt on the marital residence is his responsibility. We respectfully disagree.

Contrary to Husband's assertion, the trial court did not order that Husband pay all of the debt on the marital home. The current mortgage on the marital residence combines what were previously two separate debts: a $150,000 line of credit taken out by Husband to help finance his business, and the original mortgage on the marital home. In its final order, the trial court decreed that Husband would be responsible for the $150,000 debt "which debt was incurred for the business awarded to Mr. Mooneyham." To accomplish this intention, the court increased the alimony award by the amount of the mortgage payment (from $4,000 to $5,847 a month) and ordered Husband to pay this amount to Wife until the mortgage was reduced by $150,000. The court further provided: "Once the $150,000.00 has been paid by Mr. Mooneyham on the mortgage on the residence awarded to Ms. Burton, then the alimony shall revert to $4,000.00 per month . . . ." The effect of this arrangement is that, once the $150,000 has been paid off, Wife is responsible for paying the remainder of the mortgage.

Husband objects to this interpretation on the basis that, although Wife signed the deed of trust, her name is not on the note. As a result, Husband argues, he is legally responsible for the remainder of the indebtedness on the house. However, we find that the court intended Wife to be responsible for the remainder of the mortgage. It is possible that Wife could refinance the mortgage once Husband has paid off the first $150,000. In any event, the trial court has implicitly ordered her to pay the remainder of the mortgage. Should she fail to do so, she risks losing her home.

Although Husband requests that the trial court make the *entire* debt on the mortgage Wife's responsibility, he has not presented any cogent argument to justify requiring Wife to pay the $150,000 that originated in the line of credit. The evidence does not preponderate against the trial court's finding that this money was used to finance Husband's business; the trial court did not err in requiring Husband to pay off this part of the loan.

*Division of marital assets*

Much of Husband's argument with respect to the division of marital assets is premised upon his assumption, rejected above, that Wife is not responsible for any part of the debt on the marital residence. He also argues generally that he received a "grossly inequitable" share of the net marital estate.

Husband and Wife offer widely divergent calculations regarding the net value of the marital estate and the proportion of that value awarded to each. Based upon his assertion that his business had no value, Husband argues that he received zero percent of the net value of the estate. Wife somehow calculates that she received 42% of the net marital estate while Husband received 58%. The trial court allocated the two main marital assets as follows: Wife received the marital home and Husband received his business as well as $150,000 of the debt on the marital home, a debt that the trial court found was used to fund Husband's business. Under this framework, Wife received a greater portion of the marital estate.

A trial court has a great deal of discretion in determining the manner in which it divides marital property, and an appellate court will generally defer to a trial court's decision unless that decision is inconsistent with the factors set out in Tenn. Code Ann. § 36-4-121(c) or the evidence preponderates against the decision. *Jolly v. Jolly,* 130 S.W.3d 783, 785-86 (Tenn. 2004). An equitable distribution is not necessarily an equal one. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

Tenn. Code Ann. § 36-4-121(c) instructs the court to consider all relevant factors in making an equitable division of marital property, including the following:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

-10-

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

We consider the following factors to be relevant in this case. Factor 1, the 25-year duration of the marriage, seems to favor of a fairly equal division of the assets. The considerations listed in factor 2 cut in favor of Wife in that she was not employed through most of the marriage, and while she is licensed dental hygienist, she will not be able to attain an earning capacity near that of Husband. As to factor 4, Husband has a greater ability to acquire capital assets and income in light of his experience in the car industry and the fact that he retains the car business. With respect to factor 5, there was evidence presented concerning Husband's use of business funds for personal expenses and to support his mother and son; it appears that this pattern existed for many years and was not a reflection of Husband's attempt to dissipate assets in anticipation of divorce. *See generally Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010) (discussion of dissipation of assets).

We cannot say that the trial court's decision is inconsistent with the statutory factors or that the evidence preponderates against the court's division of the marital assets. While Wife undoubtedly received a greater share of the net estate, this fact results in large part from

the financial troubles of Husband's business. We see no justification for Wife to be saddled with the $150,000 debt on the marital home when that money was used to support Husband's business.

2.

Husband does not disagree with the trial court's decision to award Wife alimony in futuro, but he disagrees with the amount and length of the alimony award. Since we have addressed the $1,847 a month used to pay off the first $150,000 of the mortgage, we will confine our discussion here to the base alimony award of $4,000 per month until Wife's remarriage or the death of either party.

A trial court has broad discretion to determine the need for spousal support, as well as the appropriate nature, amount, and duration of that support. Tenn. Code Ann. § 36-5-121; *Bratton v. Bratton,* 136 S.W.3d 595, 605 (Tenn. 2004). An award of spousal support will not be disturbed on appeal absent an abuse of the trial court's discretion. *Broadbent v. Broadbent,* 211 S.W.3d 216, 220 (Tenn. 2006). Under the abuse of discretion standard, a reviewing court cannot substitute its judgment for the trial court's judgment. *Wright ex rel. Wright v. Wright,* 337 S.W.3d 166, 176 (Tenn. 2011). Rather, a reviewing court will find an abuse of discretion only if the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.,* 249 S.W.3d 346, 358 (Tenn. 2008); *see also Lee Med., Inc. v. Beecher,* 312 S.W.3d 515, 524 (Tenn. 2010). Therefore, "when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105-06 (Tenn. 2011).

Our Supreme Court has recognized the principle that "a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors." *Id.* at 105 (footnote omitted). Decisions regarding the nature and amount of spousal support hinge upon the unique facts of each case and require careful consideration of the factors found at Tenn. Code Ann. § 36-5-121(i).[4] *Oakes v. Oakes,* 235 S.W.3d 152, 160

---

[4]Tenn. Code Ann. § 36-5-121(i) instructs the court to consider all relevant factors in determining whether spousal support is appropriate and in determining the nature, amount, length of term, and manner of payment, including the following:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party,
> (continued...)

-12-

(Tenn. Ct. App. 2007). The single most important consideration for the court in awarding alimony is the need of the disadvantaged spouse seeking support, followed by the ability of the obligor spouse to pay support. *Bratton,* 136 S.W.3d at 602; *Oakes,* 235 S.W.3d at 160.

Husband does not specifically argue that he lacks the ability[5] to pay the ordered amount of alimony but focuses on Wife's need. Husband asserts that the trial court's decision is contrary to caselaw, most recently *Gonsewski*; he quotes passages emphasizing the economic realities of divorce and recognizing that parties often cannot maintain the standard of living enjoyed during the marriage after they are divorced. *See, e.g.*, *Gonsewski*, 305 S.W.3d at 113; *Robertson*, 76 S.W.3d at 340. Cases have also recognized, however, that the parties' standard of living during the marriage remains a statutory factor, as set forth at Tenn. Code Ann. § 36-5-121(i)(9), to be considered in the court's alimony decision. *See Gonsewski*, 350 S.W.3d at 111; *Gorman v. Gorman*, M2010-02620-COA-R3-CV, 2011 WL 5599867, at *9 (Tenn. Ct. App. Nov. 16, 2011); *Wiser v. Wiser*, 339 S.W.3d 1, 16-17 (Tenn. Ct. App. 2010).

---

[4](...continued)
including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

[5]In ruling on post-trial motions and discussing Husband's ability to pay, the trial court noted that Husband paid himself a salary of between $120,000 and $150,000 a year and also provided support for his mother and his adult son out of his business.

Husband asserts that Wife's statement of expenses includes "extreme" expenses, such as $250 a month for beauty and barber shop expenses, $406 a month for veterinary expenses, $400 a month for recreational expenses, $125 a month for facial and makeup expenses, $200 a month for gifts, $363 a month for pool expenses, and $400 for a personal trainer.[6] Even without these expenses (or the house payment), Wife's total expenses (Exhibit 21) add up to approximately $5,000 a month. Moreover, Wife gave testimony as to why certain of these allegedly "extreme" expenses were necessary, and we give great deference to the trial court's assessment of witness credibility. *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). Wife's statement of income and expenses showed net monthly income of $1,280.57 (derived from several part time positions), but Husband argues that she was capable of working full time. Wife, a licensed dental hygienist, did not work during most of the parties' marriage; she testified about her efforts to find more work as a dental hygienist but stated that she had only been able to find one and a half days of work per week. In making its alimony award, the trial court implicitly credited Wife's testimony concerning her expenses and needs.

Looking at the entire record, we cannot say that the trial court abused its discretion in setting the amount or length of Wife's alimony.

*Attorney fees*

Husband's final argument is that the trial court erred in awarding Wife alimony in solido in the amount of $24,904.95 for her attorney fees. While acknowledging that the trial court had the authority to award attorney fees in the form of alimony in solido, Husband objects to the decision to do so in this case in light of the "extraordinarily large percentage of marital assets awarded" to Wife and the "extraordinarily high amount of alimony" he is required to pay. He takes the position that Wife has sufficient assets to pay her own attorney fees.

Decisions to award attorney fees are reviewed under an abuse of discretion standard. *Huntley v. Huntley*, 61 S .W.3d 329, 341 (Tenn. Ct. App. 2001). Thus, we are required to uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness," and "we are not permitted to substitute our judgment for that of the trial court." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007).

Viewing the record as a whole, we cannot say that the trial court abused its discretion in awarding Wife her attorney fees.

---

[6]Wife testified that her total medical and dental expense amount included $300 a month for a personal trainer because her chiropractor suggested that she exercise to help her back.

CONCLUSION

We affirm the trial court's decision, and we decline Wife's request for an award of attorney fees on appeal. Costs of appeal are assessed against Husband, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE