IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2023

## STATE OF TENNESSEE v. TERRELL CRAFT

**Appeal from the Criminal Court for Shelby County**
**No. 19-05168    Paula Skahan, Judge**

### No. W2023-00152-CCA-R3-CD

The defendant, Terrell Craft, appeals his Shelby County Criminal Court jury convictions of second degree murder and three counts of aggravated assault, challenging the sufficiency of the convicting evidence and the trial court's omission of a jury instruction on the defense of necessity.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and MATTHEW J. WILSON, JJ., joined.

Josie S. Holland (on appeal), C. Alexandria Jones (at trial and on appeal), and James Jones (at trial), Memphis Tennessee, for the appellant, Terrell Craft.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Steve Mulroy, District Attorney General; and Theresa McCusker and Tanisha Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Shelby County Grand Jury charged the defendant with one count of first degree murder and three counts of aggravated assault in relation to the June 14, 2019 murder of the victim, Corrisha "Rasha" Teal.

At the defendant's May 2022 trial, Shavonda Taylor testified that she and the victim had been dating for 10 years prior to the victim's death.  On June 14, 2019, Ms. Taylor and the victim moved their belongings from their previous apartment into the Waterview Apartments in Memphis.  The couple was assisted by the victim's niece and nephew, Takeria "Tootsie Pop" Ayers and Jacquez Withers.  The victim drove herself, Ms.

Taylor, Ms. Ayers, and Mr. Withers to the Waterview Apartments, where she noticed a man, identified by Ms. Taylor as the defendant, walking near the apartments. The victim told Ms. Taylor to "keep your eye on [the defendant]." Ms. Taylor stated that though she briefly lost sight of the defendant as the victim parked her vehicle, she saw him again once they had stopped moving. Ms. Taylor said that prior to June 14, 2019, she had never seen the defendant.

Ms. Taylor testified that while she, the victim, Ms. Ayers, and Mr. Withers exited the victim's vehicle, the defendant continued to walk alone on a sidewalk near the apartment complex. The victim and her companions exited the vehicle and moved to its trunk, where several of the couple's televisions were stored. Ms. Taylor stated that the defendant then approached the front of the victim's vehicle and "was just looking" at the victim. Ms. Taylor said that this prompted the victim to say to her, "Mane, bae, what this bitch ass n**** on?" Ms. Taylor testified that the defendant then asked what the victim had said and that the victim did not respond but instead "walked off from the car." As she walked away, the defendant "cut [the victim] off" by stepping in front of her to block her path. Ms. Taylor testified that the victim then turned around to look at the defendant, who "pulled the gun out and put it to her head," shooting her twice. Ms. Taylor stated that she had not seen the defendant's firearm until he shot the victim.

Ms. Taylor testified that after the defendant shot the victim, he stood over the victim's body as though "he was [about] to shoot her" again. Ms. Taylor stated that she began screaming after she saw the victim fall to the ground and that the defendant thereafter pointed his firearm towards her, Ms. Ayers, and Mr. Withers, and walked towards them. She stated that this made her "[feel] like my life was in danger" and that she, Ms. Ayers, and Mr. Withers quickly fled the scene. After running a short distance away, Ms. Taylor looked back towards the victim's body and saw that the defendant had gone. She then returned to the victim's body, held her, and instructed Mr. Withers to give her his shirt so she could "cover [the victim's] face up" while they awaited the arrival of the police and an ambulance.

Ms. Taylor stated that the victim "always" carried a firearm on her person because their previous apartment was frequently burglarized. She testified that before she and the victim left their previous apartment on June 14, 2019, she observed the victim tuck her "silver nine-millimeter" pistol into her boxer shorts. Ms. Taylor stated that the firearm was obscured underneath the victim's sweatpants and the "big shirt" she wore and that she did not see the victim display her firearm at any point during her encounter with the defendant.

On cross examination, Ms. Taylor stated that she did not recall testifying at the defendant's preliminary hearing that the defendant had previously lived next door to the victim and herself. She also clarified that the defendant did not actually cut the victim off by blocking her path but rather that the victim "walked off first. But once [the victim]

turned around, [the defendant] was right there." She admitted that she neglected to include this aspect of the encounter in her initial statement to the police. She maintained that the victim never spoke to the defendant but instead directed her comments to Ms. Taylor.

Ms. Ayers testified that she traveled with the victim, Ms. Taylor, and Mr. Withers on the day of the victim's murder. She stated that the victim drove them to the Waterview Apartment complex and that they entered it through the back gate, near the pool. Ms. Ayers noticed the defendant standing near "the pool area" and saw him give the victim a "mean look." Ms. Ayers testified that the victim instructed the occupants of her vehicle to watch the defendant while the victim backed her vehicle into a parking space. Ms. Ayers then exited and moved towards the vehicle's trunk, where the victim and Ms. Taylor's televisions were stored. She stated that the victim attempted to pull a television out of the trunk when the defendant reemerged and approached the victim. Ms. Ayers testified that when the victim saw the defendant, the victim asked, "Dang, what you on?" Ms. Ayers stated that the defendant did not respond and continued walking. She testified that the victim then pushed the television back into her trunk, looked at Ms. Ayers, Ms. Taylor, and Mr. Withers, and stated, "Bitch ass n****." The victim then walked away until the defendant asked her what she said and "blocked her off" near the sidewalk's curb. Ms. Ayers testified that the victim and the defendant looked at each other "face-to-face" until the victim looked down for a moment, at which point the defendant shot her in the head.

Ms. Ayers testified that after the defendant shot the victim, Ms. Taylor began crying and pleading with him not to do so again. She stated that the defendant stood over the victim after shooting her and then lifted his firearm toward her, Ms. Taylor, and Mr. Withers. Ms. Ayers recalled that she ran away until she saw that the defendant had left the victim's body, at which point she returned. She testified that Mr. Withers thereafter called 9-1-1.

Ms. Ayers testified that although she did not see the defendant's firearm before he shot the victim, she heard two gunshots before the victim fell to the ground. She stated that the victim had placed her firearm on top of her vehicle's radio on their drive to the Waterview Apartments and that she watched the victim place the firearm into the waistband of her pants "below her stomach" when they arrived. She further testified that when she returned to the victim's body after the victim was shot, she saw that the victim's shirt had been lifted up and that her firearm was missing.

On cross-examination, Ms. Ayers stated that when the police arrived, she provided a statement that the defendant had "cornered" the victim prior to shooting her. She testified that she did not see the defendant take the victim's firearm from her body before he disappeared.

Jacqueline Watkins testified that she had previously worked as a clerk for the Criminal Court for Shelby County. She identified two recordings from the defendant's

July 23, 2019 preliminary hearing, with the former containing the entirety of the defendant's preliminary hearing and the latter being isolated to Mr. Withers' testimony. Ms. Ayers testified that Mr. Withers had recently passed away due to injuries sustained in an automobile accident. The recording of his preliminary hearing testimony was played for the jury.

At the defendant's preliminary hearing, Mr. Withers testified that after arriving at the Waterview Apartments with the victim, Ms. Taylor, and Ms. Ayers, he walked to the back of the victim's vehicle to help her move her belongings. He testified that he heard the victim say "What's up with this bitch ass n****?" while he was looking away. He stated that he did not see the defendant shoot the victim but recalled that he heard between two and three gunshots. He testified that after the defendant shot the victim, the defendant retrieved her firearm from her body. Mr. Withers said that he did not see the victim display her firearm during her encounter with the defendant. He recalled that he ran away after the victim was shot and located "some men" near the apartment and requested to use their cell phones. He thereafter called his mother.

On cross-examination, Mr. Withers testified that he first saw the defendant when the victim backed her vehicle into a parking spot at the Waterview Apartments. He did not recall whether the defendant said anything to the victim. He also stated that he saw the defendant remove his firearm from a pocket in his cargo pants.

Officer Joseph Bacchus of the Memphis Police Department ("MPD") testified that he was among the first officers to respond to the report that a black woman had been shot on Birch Lake Drive on June 14, 2019. He recalled that he saw the victim lying near a vehicle and that he subsequently helped secure the crime scene. After securing the scene, he was advised that a "suspect called in advising that he shot" the victim and stated that he was "by the leasing office."

On cross-examination, Officer Bacchus testified that he interviewed Ms. Taylor upon arriving at the crime scene. Though he recalled wearing a body camera during the interview, he could not remember whether it had been activated during his interview with Ms. Taylor. Officer Bacchus also testified that he recovered a number of spent bullet casings from the crime scene.

Doctor Erica Curry of the Shelby County Medical Examiner's Office testified as an expert in forensic pathology regarding her June 15, 2019 autopsy of the victim's body. She determined that the victim had suffered four gunshot wounds prior to her death. The first gunshot wound, fired at close range, was located on the right side of the victim's head near her scalp; the second gunshot wound, fired at intermediate range, was located on the victim's upper back; the third gunshot wound, fired at intermediate range, was located on the victim's left ankle; and the fourth gunshot wound, fired at close range, grazed the victim's upper left arm. She testified that the first gunshot wound was

fatal. Doctor Curry also identified skin abrasions on the victim's face, forehead, cheeks, neck, back, left arm, left leg, and both hands, which she stated could be consistent with someone who had been shot and had subsequently fallen onto concrete. Doctor Curry removed bullet fragments from the victim's shirt and hair, which were sent to the Tennessee Bureau of Investigation ("TBI") for examination.

Officer Linda Rogers of the MPD testified that she collected evidence and photographed the crime scene. Through her investigation, Officer Rogers collected and identified, among other things, spent bullet casings and blood on the ground. She identified four nine-millimeter bullet casings, one 40-caliber bullet casing, and two unknown bullet fragments. She testified that she also traveled to the leasing office for the Waterview Apartments, where she identified and collected two firearms stacked on top of one another underneath a pickup truck. She testified that one of the firearms was a Taurus pistol and the other was a Ruger pistol.

Special Agent Kasia Lynch of the TBI testified that she reviewed two pistols, three nine-millimeter cartridges, four nine-millimeter cartridge casings, one 40-caliber Smith and Wesson cartridge case, and a number of bullet fragments. She testified that one pistol was a Taurus nine-millimeter pistol and the other was a Ruger nine-millimeter pistol. After testing the firearms, she determined that the cartridge casings recovered from the crime scene matched the class characteristics of both the firearms and some of the individual characteristics of the Ruger firearm. She noted that her examination did not provide enough evidence to determine conclusively whether the recovered cartridge casings had been fired from either firearm.

Special Agent Lynch testified that after this examination, she received several other bullet fragments from the Shelby County Medical Examiner's Office. After examination, she determined that one of the bullet fragments, which had been recovered from the victim's shirt, had been fired from the Ruger pistol. She was unable to say whether any of the recovered bullet casings had been fired from the Taurus pistol.

On cross-examination, Special Agent Lynch reiterated that she was only able to determine that one of the three bullet fragments she examined came from the Ruger pistol. Though she noted that two of the bullet fragments shared characteristics with the Taurus pistol, she was unable to determine whether they had been fired from the Taurus or the Ruger pistols.

Sergeant Jason Battle of the MPD testified that he assisted Sergeant S. Green with the defendant's June 14, 2019 interview. A recording of this interview was played for the jury. Prior to the interview, Sergeant Green presented the defendant an "Advice of Rights" form and reviewed it with him. The defendant signed the form and did not request an attorney.

During the interview, the defendant stated that he had been returning from a luau party at the Waterview Apartments when he saw the victim arrive with Ms. Taylor, Ms. Ayers, and Mr. Withers. He said that he recognized the victim and observed her remove a firearm from her vehicle. He stated that he spoke to the victim and that she responded by calling him a "bitch" and "cursing him out." The defendant recalled that the victim drew her gun and pointed it at the ground after she cursed at him. He said that he then retrieved his firearm and shot the victim "three or four times." He then retrieved the victim's firearm from where it had fallen beside her and told Ms. Taylor, Ms. Ayers, and Mr. Withers not to return as they ran away.

Throughout his interview, the defendant maintained that he shot the victim in self-defense because he saw that she was armed and because she had disrespected him. Near the end of the interview, Sergeant Green provided the defendant with a photograph of the victim, upon which he wrote, "This is the young lady that disrespected me with a gun in hand. After profane language (bitch) with a gun in her hand. And with self-defense I had a gun as well and fired. (Four rounds were shot)." He signed this statement and the interview concluded. Sergeant Battle testified that his involvement with the investigation was limited to assisting with the defendant's interview.

Sergeant Latanya West of the MPD testified that she also assisted Sergeant Green with the defendant's interview. Approximately one hour after Sergeants Green and Battle concluded their interview, Sergeant Green returned with Sergeant West, who reviewed the defendant's statements in the previous portion of his interview and transcribed his answers. A recording of the interview was played for the jury. During the interview, the defendant supplemented his handwritten statement by writing "I Terrell Craft was the one who defended myself and pulled the trigger."

On cross-examination, Sergeant West conceded that her transcribed report of the defendant's interview did not include the entirety of the interview, but she nevertheless maintained that she recorded "pretty much every word." She also stated that the four-page statement was close to a transcript of the defendant's interview. On redirect examination, Sergeant West testified that any part of the interview omitted from her transcript would have been preserved in the recording.

The State rested. After a *Momon* colloquy, the defendant elected not to testify and did not present proof. On this evidence, the jury convicted the defendant of one count of second degree murder and three counts of aggravated assault. Following a sentencing hearing, the trial court imposed an effective sentence of 23 years. The defendant filed a timely but unsuccessful motion for new trial. This timely appeal followed.

On appeal, the defendant challenges the sufficiency of the convicting evidence and the trial court's omission of a jury instruction on the defense of necessity.

*I. Sufficiency*

The defendant argues that the evidence is insufficient to sustain his conviction for second degree murder because the State failed to disprove that the defendant acted in self-defense. He maintains that the evidence indicates that he was walking past the victim's vehicle when the victim separated herself from Ms. Taylor, Ms. Ayers, and Mr. Withers "to have a face-to-face confrontation." The defendant argues that before he shot the victim, she "looked down, towards where her gun was in her waistband." He contends that though both the defendant and the victim's firearms held nine-millimeter bullets, Special Agent Lynch was only able to match one bullet fragment to the defendant's Ruger pistol, while she was unable to determine the source of the other fragments. The defendant maintains that Doctor Curry's testimony that the first gunshot wound was fatal, coupled with Ms. Taylor and Ms. Ayers' testimony that the victim did not fall to the ground until they heard the second gunshot, indicates that the victim fired her weapon at the defendant before the defendant shot the victim. The State responds that the evidence overwhelmingly supports the defendant's conviction.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant here, second degree murder is "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(b). Code section 39-11-611(b)(2) sets the parameters of self-defense:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
(C) The belief of danger is founded upon reasonable grounds.

*Id.* § 39-11-611(b) (Supp. 2018). It is well settled that the defendant cannot be the initial aggressor in order to avail himself of self-defense. *Smith v. State*, 60 S.W. 145, 148 (Tenn. 1900). The jury, upon review of the proof, determines whether self-defense applies. *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012).

Here, we cannot agree that the evidence was insufficient to convict the defendant. The proof adduced at trial established that the defendant knowingly killed the victim, and the defendant does not contest this. The sum of the defendant's arguments regarding the sufficiency of the evidence relative to his theory of self-defense boils down to the issue of his and the State's differing versions of events. Ms. Ayers testified that the victim looked down briefly before she was shot, and the defendant contends that this was a glance towards her firearm. The defendant, both in his statement and in his recorded post-arrest interview, claims that the victim brandished her firearm at him and that he reacted in self-defense after she disrespected him. Three witnesses, Mr. Withers at the defendant's preliminary hearing and Ms. Taylor and Ms. Ayers at the defendant's trial, testified instead that the victim did not draw her firearm during her encounter with the defendant. Further, though Special Agent Lynch testified that she was only able to link one of the recovered spent bullet fragments to the defendant's Ruger pistol, she also noted that it is not unusual to be unable to make conclusive determinations in firearms identifications. Affording the State all reasonable and legitimate inferences which may be drawn from this evidence, we cannot say that the jury acted irrationally. The jury, upon its review of this conflicting evidence, accredited the State's evidence by convicting the defendant and rejecting his theory of self-defense. The jury thereby resolved any conflict in the evidence, and we will not disturb this conclusion. *See Cabbage*, 571 S.W.2d at 835.

## II. Jury Instruction

The defendant also argues that the trial court erred by neglecting to instruct the jury on the defense of necessity. This is the first time the defendant has raised this

issue, and he concedes that it would normally be waived. *See* Tenn. R. App. P. 3(e) ("No issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived."). The defendant nevertheless contends that the trial court committed plain error in neglecting to instruct the jury on the defense of necessity.

This court may review certain issues not properly preserved for appeal when the issue affects the substantial rights of a party, but our review is limited to plain error review. *See* Tenn. R. App. P. 36(b). All five of the following factors must be met to grant relief under plain error review:

> (a) [T]he record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Relief under the *Adkisson* test is limited to those instances in which the plain error "more probably than not affected the verdict returned by the jury." *Adkisson*, 899 S.W.2d at 646 (footnotes omitted). Additionally, "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283.

In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, it follows that the trial court has a duty to give a complete charge of the law applicable to the facts of a case. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The failure to do so deprives the defendant of the constitutional right to a jury trial. *Garrison*, 40 S.W.3d at 432. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Notably, when jury instructions fully and fairly state the applicable law, a trial court is not required to provide special instructions. *State v. Mann*, 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Kelley*, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984).

Necessity is a general defense which need not be submitted to the jury unless it is fairly raised by the proof at trial. *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (citing *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013)).

To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Whenever admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury.

*Hawkins*, 406 S.W.3d at 129 (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). Necessity justifies a defendant's otherwise criminal conduct when both "(1) [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm; and (2) [t]he desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness." T.C.A. § 39-11-609. The defense "contemplate[s] a balancing between the harm caused by the conduct constituting an offense, and the harm the defendant sought to avoid by the conduct." *Id.*, Sentencing Comm'n Comments. Traditionally, necessity has been applied where "the extreme situation is brought on by something other than a human act," such as "a ship violating an embargo law to avoid a storm, a pharmacist providing medication without a prescription to alleviate someone's suffering during an emergency, or one of two shipwrecked sailors pushing the other off the float to save his own life." *State v. Aaron T. James*, No. M2004-00808-CCA-R3-CD, 2005 WL 1521965, at *6 (Tenn. Crim. App., Nashville, June 21, 2005) (internal citations omitted).

Viewing the evidence in the light most favorable to the defendant and with necessity's balancing test in mind, we cannot say that the trial court erred in neglecting to submit a necessity instruction to the jury. The defendant maintains that the victim pointed her firearm at him and that he responded in self-defense to her insults in spite of conflicting testimony from Ms. Taylor and Ms. Ayers that the victim did not brandish her weapon during her encounter with the defendant. This conflicting evidence justified the trial court's instruction of self-defense, but not necessity, because "[a]ssuming that death is the maximum harm that an individual can suffer, the harm resulting from a homicide can never be less than the harm sought to be avoided by a defendant." *Marquis D. Hendricks v. State*, No. E2016-02123-CCA-R3-PC, 2017 WL 3174074, at *7 (Tenn. Crim. App., Knoxville, July 26, 2017). In other words, the harm the defendant sought to avoid was equivalent to the harm he inflicted upon the victim, so the balancing test for the necessity defense was not satisfied. The defendant also did not establish that a non-human act prompted his murder of the victim. *See State v. Anthony Eugene Poole*, No. M2010-01179-CCA-R3-CD, 2012 WL 826605, at *7 (Tenn. Crim. App., Nashville, Mar. 9, 2012) (analyzing the history of the common law defense of necessity and concluding that it did not apply where the evidence demonstrated provocation arising from a human, rather than non-human, source). Thus, the defense of necessity was not fairly raised by the evidence, and the trial court was not required to submit the instruction to the jury. We therefore find no error in the trial court's omission of a necessity instruction in this case.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE